[L. A. No. 19140.   In Bank.   July 13, 1945.]

FRED A. SHAEFFER, Petitioner, v. THE STATE BAR OF
CALIFORNIA, Respondent.

T. A. Twitchell for Petitioner.

Edward J. Trevey and John A. Westwick for Respondent.

THE COURT.—This is a proceeding to review an order of the Board of Governors of The State Bar recommending

that petitioner be suspended from the practice of the law for a period of two years.

The charges against petitioner were set forth in an order to show cause containing eleven counts, some of them involving personal business dealings unconnected with his practice of the law while others pertain to his conduct as an attorney. At the conclusion of its hearings the local administrative committee found against petitioner on all counts except count three, and recommended that he be suspended for a minimum period of one year. The Board of Governors adopted the committee's findings with modifications. In this latter respect, it rejected the findings favorable to petitioner on count three and substituted its own adverse findings. However, it dismissed counts one and four. The board thereupon recommended that petitioner be suspended for a period of two years, adding that in fixing the degree of discipline recommended it took into consideration the prior suspension of petitioner for three years, ordered by this court on April 30, 1934 (*Shaeffer* v. *State Bar*, 220 Cal. 681 [32 P.2d 140]), which suspension was subsequently terminated on January 7, 1936.

Petitioner challenges the sufficiency of the evidence to support the findings or to show acts warranting discipline.

### Count Two.

■ This count charged petitioner with having violated rule 12 of the Rules of Professional Conduct which provides that "A member of the State Bar shall not communicate with a party represented by counsel upon a subject of controversy, in the absence and without the consent of such counsel." In October, 1940, a will was admitted to probate upon the petition of the executrix named therein. In April, 1941, a brother of the testator, who was not mentioned in the will, communicated with petitioner requesting him to look after his interests in the estate. He gave petitioner the name of the attorney who had drawn the will, and suggested that a copy could be obtained from the attorney. The brother also mentioned a prior will which assertedly named him as a beneficiary and gave petitioner the names of certain persons who might have information with respect to either or both of the wills. Shortly thereafter petitioner telephoned to the attorney who had drawn the will then being probated, and informed him he represented a brother of the testator, and asked for a copy of the will. It was mailed to petitioner. While

this attorney had offered the will for probate on behalf of the executrix, he did not recall telling petitioner in this conversation that he represented the executrix, and petitioner testified he had not seen the probate file. Several days later petitioner went into the country to interview the persons whose names had been given to him by his client, with a view to getting information with respect to the execution of the will and the possible existence of a second will. After making inquiries as to the whereabouts of these persons, petitioner came to the home of the person named as executrix and interrogated her regarding the testator and his wills. The executrix testified that she informed petitioner that the other attorney, whom she named, represented her and that petitioner should see him with respect to his inquiries. Petitioner left shortly thereafter and there is nothing in the record which indicates that he made any effort to take advantage of the executrix or to improperly obtain any information from her. In our opinion, the evidence does not support a charge of professional misconduct.

### Count Three.

During the period 1932-1940 petitioner had served as attorney for a client who was in the beverage business. In the course of this relationship petitioner had not only rendered legal services but from time to time had advanced money to the client for the purchase of equipment and stock. Petitioner testified that in 1937 the client was indebted to him in a sum in excess of $2,000, representing unpaid legal fees and loans. He was also indebted to petitioner, according to the latter's statement, in the further sum of $1,500, representing the aggregate of unpaid loans made by the client's brother-in-law and assigned by the latter to petitioner. At the time of the hearings before the local administrative committee in 1943 the client was dead, but petitioner's testimony as to the existence of these two debts and the assignment of the latter to him is corroborated in many essentials by the testimony of the client's wife and brother-in-law. Thus, there is testimony that in 1937 the client was indebted to petitioner in an amount approximating $3,500. Respondent, however, refers to a statement sent by petitioner to the client in November, 1937, showing a balance due of $198.11. Petitioner explained that this statement included only the charges for specific services rendered to the client in connection with the

Coca Cola account, which charges were then being paid with the approval of the Coca Cola Company, and that the statement did not include his charge for other services that had been rendered or the loans theretofore made to the client.

The client was indebted, to petitioner's knowledge, to the Coca Cola Company in the sum of $7,400. The company was pressing for payment of its claim. In view of this, the debtor and petitioner, according to respondent, proceeded to place all of the debtor's property beyond reach of the Coca Cola Company for the purpose of defrauding it. In furtherance of the assertedly fraudulent scheme, it is urged that petitioner prepared and the client executed (1) a declaration of homestead; (2) a deed to certain property naming the client's son as grantee; and (3) a note and chattel mortgage, in the amount of $3,500, naming petitioner's secretary as payee and mortgagee, respectively. The Coca Cola Company in subsequent litigation attacked these instruments. The homestead was declared valid. The litigation in regard to the deed to the debtor's son was compromised. The chattel mortgage was held to be invalid.

Petitioner testified that prior to preparation and execution of the deed his client stated that he was indebted to his son for wages, which indebtedness was to serve as the consideration for the deed. We find no evidence controverting petitioner's testimony that he prepared the deed upon the representation of his client that he was indebted to his son for unpaid wages. The testimony of the client's wife, relied on by respondent, to the effect that they were not indebted to their son does not controvert the fact that such a representation was made by her husband to petitioner to induce the preparation of the deed. The evidence will not support a finding of fraud against petitioner in this particular.

According to petitioner, the note and chattel mortgage were executed to secure the sum of $3,500 owing to him, and his secretary named therein as payee and mortgagee represented him in the transaction. The chattel mortgage covered the client's stock in trade and fixtures, in addition to some automobile trucks. As the result of an oversight, petitioner explained, a notice of intention to execute the mortgage was not recorded as required by the code. The mortgage was therefore conclusively presumed to be fraudulent as to the stock in trade and fixtures (Civ. Code, § 3440) and was decreed to

be invalid for this reason in *Coca Cola Bottling Co.* v. *Feliciano,* 43 Cal.App.2d 652 [111 P.2d 422]. Thus petitioner gained no advantage by his failure to record the notice of intention. On the other hand, he failed to obtain a valid lien as against existing creditors.

The cited case also declared the mortgage to be invalid as to the trucks because it was given to the secretary without consideration, and when the debtor was insolvent. No showing was made in the civil action or in this proceeding that petitioner's claim against the client had been assigned to his secretary, but he testified that she represented him in the transaction. Petitioner also testified that his client felt the Coca Cola Company was unfairly pressing him for payment of its claim after he had built up the business and he therefore decided he ''wanted to protect other people who had been friendly to him, who had financed him and kept him going.'' Petitioner further testified that he ''thought and I still think . . . that a debtor has the right to prefer a creditor when he owes money.'' (See Civ. Code, §§ 3431, 3432, 3451.) The evidence shows that an indebtedness existed in petitioner's favor in the amount of the note and mortgage and that the secretary represented him in the transaction. Under the circumstances, we are of the opinion that the local administrative committee correctly concluded that petitioner's conduct was not fraudulent.

### Counts 5, 6, 7 and 8.

These several counts have been consolidated by the parties and will be considered together. They do not involve an attorney-client relationship and have to do solely with personal business transactions in which petitioner was dealing at arm's length with the other parties. Respondent contends, however, that ''the acts of petitioner involved moral turpitude and dishonesty'' and that he was guilty of ''gross negligence in his conduct of his professional work.'' The charges arose out of petitioner's sale of small interests in an oil lease to two business men named Yelkin and Rice. It appears that Yelkin, a real estate broker, who had oil properties in the same area and admittedly was familiar with oil ventures and their speculative nature, was told by petitioner that for $750 he could acquire a one per cent interest in a second well about to be drilled under a lease in which petitioner and others were interested. Yelkin agreed to invest and gave petitioner

$375 in cash and a receipt cancelling an indebtedness of $375 owing to him by R. W. Wilson, one of petitioner's associates in the venture. Yelkin testified that at the time he cancelled the Wilson indebtedness he had no hope of otherwise collecting it because of Wilson's financial status. The evidence discloses that all of the cash received by petitioner from Yelkin went into the drilling operations. Later, Yelkin invested $750 for a one per cent interest in a third well to be drilled on the property. Difficulties were encountered in the drilling operations and thereafter no dividends were paid. Approximately two years later, Yelkin turned the matter over to an attorney for the purpose of salvaging what he could from the investment. Yelkin's attorney and petitioner worked out a compromise settlement, without suit, whereby petitioner personally paid Yelkin $1,000. This sum plus dividends received, exceeds the cash investment made by Yelkin. The balance of his investment, represented by cancellation of the $375 Wilson indebtedness, probably would have been lost to him even if he had not entered the oil venture with petitioner. Thus, for all practical purposes, Yelkin was wholly reimbursed. In fact, he testified that at the time of the settlement with petitioner he was entirely satisfied with the outcome of the matter and remained so at the time of the hearings herein.

Counts 7 and 8 are substantially the same as counts 5 and 6, except that they involve two separate cash investments of $750 each by Rice, a real estate salesman and partner of Yelkin, who likewise received a one per cent interest in the oil lease for each investment. Rice, having heard of his partner's investment in the oil venture, sought out petitioner and solicited the right to invest. He, like Yelkin, had previously had experiences with oil leases and was acquainted with their speculative nature. He testified that petitioner had made no representations to him as to when he might expect a financial return on the investments. Several years later he consulted an attorney solely for the purpose of ascertaining whether he had any money coming from the venture. Petitioner worked out a compromise whereby he paid to Rice $900 which, with the dividends received, aggregated a return of $994. It is significant that here, as in the Yelkin matter, the compromise and payment were made long prior to institution of this proceeding. Rice testified that he was fully aware of the risks involved in oil-lease investments and that he was wholly satis-

fied with the settlement. He added, "I have no ill feeling toward Mr. Shaeffer whatever, and if I have occasion to use an attorney, he will be the one, with due respect to everyone."

It appears that petitioner told Yelkin and Rice that they would be limited partners and that he prepared and they executed articles of limited partnership but that petitioner failed to record the certificate. Petitioner testified that he thought he had done all that was necessary to protect all persons involved in the venture and explained his failure to record the certificate by his unfamiliarity with the provisions of the code relating to limited partnerships. Respondent argues that the neglect of petitioner in this regard deprived Yelkin and Rice of the protection to which they were entitled. Inasmuch as petitioner was not acting as attorney for Yelkin and Rice it cannot be said that he violated his oath or duties as an attorney and his ignorance of the requirements of the Partnership Act cannot be said to constitute moral turpitude.

Respondent urges that petitioner should be disciplined because he sold the partnership interests to Yelkin and Rice without having first applied for or procured a permit under the Corporate Securities Act [Stats. 1917, p. 673, as amended; Deering's Gen. Laws, Act 3814]. Petitioner testified that at the time he believed that such a permit was not necessary to validate a sale of the type of interest purchased by Yelkin and Rice. In substantiation thereof he further testified that Wilson, his associate, had theretofore furnished him with a form of limited partnership agreement stating at the time that it had been prepared for him by an attorney who said that its use did not require a permit from the Corporation Commissioner. In view of this, petitioner stated that he did not check the Corporate Securities Act to ascertain if a permit was essential to the valid consummation of the Yelkin and Rice transactions. It was stipulated by respondent "that at the time of the transaction some uncertainty existed as to whether a transfer of interest by the medium of creating a limited partnership constituted a violation of the Corporate Securities Act." It is now argued by respondent that since petitioner failed to complete the formation of the limited partnership by filing a certificate, this stipulation "merely meant that if a proper limited partnership had been formed, there was at that time an uncertainty as to whether the Corporate Securities Act would have applied." The argument lacks

merit. Petitioner thought he had done everything necessary to complete the partnership and his innocent failure to comply with the Partnership Act should not subject him to discipline for an equally innocent violation of the Corporate Securities Act, particularly when, as conceded by respondent, there was uncertainty as to whether a permit was required. As before stated, since petitioner was not acting as attorney for Yelkin and Rice, no question of the violation of his oath or duties as an attorney is involved, and certainly it cannot be said under the circumstances that his failure to comply with the provisions of the Corporate Securities Act constituted moral turpitude.

### Count Nine.

■ This count charged petitioner with having misled a trial court into making an erroneous order by citing as controlling law a case which he knew was not in point and failing to cite a later case in which petitioner had been attorney of record. The evidence discloses that petitioner, as attorney for the defendant in a pending action, moved to dissolve a restraining order upon several grounds, one of which was that the amended complaint failed to state a cause of action because it incorporated by reference various allegations and exhibits of the original complaint. In presenting the motion to the court, petitioner cited the case of *People* v. *de la Guerra,* 24 Cal. 73, as holding that an amended pleading could not incorporate by reference allegations or exhibits of the original complaint. He failed, however, to cite the case of *Turney* v. *Collins,* 48 Cal.App.2d 381 [119 P.2d 954], in which six months earlier he had appeared as counsel for appellant and unsuccessfully advanced a similar contention. The latter case expressly declared that a pleading may incorporate by reference an allegation or exhibit found in another pleading in the same case, and distinguished the de la Guerra case, on the ground that it held that an exhibit set forth in the pleadings in another case could not be incorporated by reference.

Respondent urges that, by failing to cite the Turney case in which he had appeared as counsel, petitioner was guilty of an intentional effort to mislead the court in violation of subdivision (d) of section 6068 of the State Bar Act.

When the matter was called to petitioner's attention by the trial court, which in turn was apprised of the true situation

by adversary counsel, petitioner addressed a letter to the court in which he stated, and reiterates here, that in his opinion the declaration in the Turney case is dictum and did not serve to overrule the de la Guerra case relied on by him. In view of petitioner's familiarity with the Turney case, he should in all fairness have directed the trial court's attention to the decision and argued to the court the contentions which he makes here that the case was not controlling. However, since petitioner apparently left to opposing counsel, who was present, the burden of presenting the other side of the argument, and since it does not appear that petitioner intentionally attempted to mislead the court, we do not believe the incident warrants the imposition of disciplinary punishment.

### Count Ten.

The evidence and findings pertinent to this count disclose that petitioner was counsel for the plaintiffs in an accounting action. During the course of trial, petitioner secured from the clerk of the court an ordinary form of subpeona, signed in blank by the clerk. Upon instructions from petitioner, his secretary filled in the original subpoena with the names of witnesses to be served therewith, but in the copies there were also inserted the names of certain books and records which petitioner desired the witnesses to bring into court. Petitioner had not, as required by law, made application to the clerk for a subpoena duces tecum nor had he filed the affidavit necessary therefor. When the matter was later called to the attention of the trial court, petitioner was ordered to notify the constable who had served the subpoena to advise the witnesses that it was ineffective as a subpoena duces tecum.

Being unable to reach the constable that day, petitioner states he dictated and signed a letter addressed to him with instructions to carry out the court's order. The letter remained in petitioner's office, however, subject to the constable's call, the explanation being that he dropped in every day or two. Petitioner did nothing further in the matter until the court questioned him a few days later as to whether its order had been carried out. In the interim, the constable had not appeared at petitioner's office and consequently had not received the letter. Considering the fact that the parties lived in a rural community and that the constable, as testified by petitioner and his secretary, called at petitioner's office several times each week, it was not unreasonable for petitioner,

after being unable to reach the constable the same day, to leave the explanatory letter in his office for him.

Formerly a subpoena duces tecum, like an ordinary subpoena was issued without the necessity of filing an affidavit. The provision requiring an affidavit specifying the exact matters or things to be produced and the materiality thereof was added to section 1985 of the Code of Civil Procedure by amendment in 1933. While petitioner admitted that previously he had used subpoenas duces tecum in a "few cases," the evidence is silent as to whether his experience therewith was before or after the amendment. He testified that when the subpoenas were issued he was engaged in a contested trial and that their issuance in the form above described resulted from his failure to look up the law on the subject. Respondent has not shown that petitioner knowingly violated the amended section, and the evidence will not support punishment under any provisions of the State Bar Act.

### Count Eleven.

Petitioner filed a divorce complaint on behalf of a client in the Superior Court of Santa Barbara County against a nonresident defendant who was personally served on June 1, 1942, in Michigan. Thereafter an attorney of that state forwarded to the clerk of the court an answer on behalf of the defendant and served petitioner by mail with a copy. Although the answer was received on June 10, it was not filed until June 29, due to the failure of defendant's attorney to forward the filing fee. In the interim, however, petitioner, believing the answer had been filed, served by mail on defendant's counsel and filed a notice setting the trial for July 10, at Santa Maria. On that date, petitioner appeared with his client and a corroborating witness and the matter was called by Judge A. W. Westwick. It was then brought to petitioner's attention that his notice of trial was premature in that the case was not at issue when the notice was filed. Petitioner informed Judge Westwick that his client, a soldier, was in court and shortly thereafter was to leave on maneuvers, and requested permission to put on his evidence with the understanding that it could later be stricken if he did not succeed in getting a stipulation from opposing counsel permitting the cause to be heard as a default. It was further explained by petitioner that as the result of an exchange of communications with opposing counsel, the only matters in dispute concerned

attorney's fees and the support of the children, and that counsel were attempting to adjust these matters. Evidence was taken and Judge Westwick continued the case in order to enable the parties to reach an agreement and present a stipulation permitting the cause to be heard as a default.

Thereafter the parties signed a stipulation, dated July 23, which petitioner mailed to the clerk, together with a form of interlocutory decree, with the request that it be signed and filed. On July 30, petitioner received a letter from the clerk stating that Judge Westwick would not accept the stipulation and had written thereon: "This stipulation, for obvious reasons, apparent on its face, cannot be accepted by the Court, and the matter cannot, as suggested, be treated as a default matter." Judge Westwick testified he had rejected the stipulation permitting the matter to be heard as a default because it was conditioned on the making of certain orders in the divorce proceeding. The clerk at the request of the judge returned to petitioner the form of interlocutory decree with the statement that the case would be heard on August 28. On that date the matter was again continued. Petitioner testified that he talked with Judge Westwick on three or four occasions and "asked him if he had made up his mind" on the divorce case and also asked the clerk "to see if he could get a ruling in the matter." The minutes in the action disclose that on October 23, the matter was submitted "for decision and by the court taken under advisement." Sometime in October or November, 1942, petitioner testified, he asked Judge Westwick to "set the whole thing aside and set it on the calendar to be heard again." According to petitioner, Judge Westwick replied, "All right, when I go to Santa Barbara, I will set it aside and start over." On December 2, however, petitioner wrote to Judge Westwick asking "for a decision in the matter." Petitioner testified he was "either waiting for a decision or waiting for him to set it aside and let me submit new testimony." On December 12, Judge Westwick replied to a letter from petitioner and after reciting much of the chronology of the case as herein outlined, stated, "the matter, it seems to me, could easily be handled by a simple agreement between the parties and by stipulation that the matter be heard as a default matter—if the parties wished to handle it that way. . . . If you wish, I will simply deny the divorce and let it go at that." Judge Westwick testified that "so far as [he] was concerned, the testimony had been taken and it was a

mere matter of those people getting together so the children would be protected." He added that he desired a proper stipulation in place of the rejected one.

On December 17, petitioner forwarded a proposed new stipuation to defendant's attorney and informed him that the court refused to go ahead in the matter until a stipulation was filed permitting the cause to be heard as a default matter. In the meantime, petitioner testified, he and opposing counsel had reconciled their differences as to support money and fees. On December 21, defendant's counsel replied to petitioner's letter by referring to the earlier stipulation (which had been rejected by the court) but without enclosing the proposed new stipulation.

One week thereafter (December 28) petitioner appeared before another judge (Hon. E. D. Wagner) sitting in Santa Maria, and requested him to hear the divorce action. The record in the case was at Santa Barbara, the county seat, some seventy miles distant. Petitioner testified that when he asked Judge Wagner to hear the case he "assumed" that Judge Westwick had made an order setting aside the submission of the cause to him and inasmuch as the support money had been agreed upon he thought it was "perfectly satisfactory to go ahead" before Judge Wagner. In describing the nature of his request that Judge Wagner hear the cause, petitioner testified that he did not remember referring to it as a "default" but had simply asked him "if he would hear the matter." Judge Wagner testified that petitioner initially presented it to him as a "default" matter, while the court clerk did not recall that petitioner mentioned the word "default." The testimony indicates that the clerk immediately informed the court that the cause had been partially heard by Judge Westwick. Petitioner said he explained that Judge Westwick had stated he would enter an order setting aside all proceedings and for that reason he was starting over again. Petitioner also testified that he did not think the matter of whether there was an answer on file or that there was a stipulation that the matter could be heard as a default was discussed at all.

Judge Wagner, on the other hand, testified that on the morning in question petitioner "asked if we could hear a short default"; that the clerk called his attention to the fact that testimony had been taken in the case before Judge West-

wick; that petitioner explained the matter "was partially heard before Judge Westwick, but we are starting again. . . . We are proceeding in the matter as a default." Petitioner informed him, Judge Wagner testified, that there was a stipulation on file permitting the matter to be heard as a default. The clerk testified to the same effect as regards petitioner's reference to the stipulation, adding that petitioner said Judge Westwick had relieved himself of the case and that it was all right to proceed. The record reveals, and petitioner's testimony discloses, that a formal stipulation had not been submitted or filed other than the one submitted several months earlier which had been rejected by Judge Westwick. Judge Wagner refused to proceed and during the court recess unsuccessfully attempted to reach Judge Westwick by telephone, but talked with the clerk in Santa Barbara and learned an answer was on file. After the recess Judge Wagner told petitioner he would not hear any portion of the matter.

Following his unsuccessful effort to have Judge Wagner hear the matter, petitioner addressed a letter to Judge Westwick requesting that he order the case on the calendar "so that the same can be reset and let us get it cleaned up in that manner. As soon as it is restored to the calendar, I will file another Memorandum of Motion to Set and get it disposed of." As events later developed, however, the parties finally agreed upon and filed sometime in the middle of January, 1943, a stipulation satisfactory to Judge Westwick who, on February 8, 1943, ordered the prior testimony stricken and after further hearing, granted an interlocutory decree of divorce.

It thus appears that in order to have the matter heard petitioner misrepresented to Judge Wagner the actual status of the case. His conduct in this regard constituted a violation of section 6068 (subds. b and d) of the State Bar Act in that it reveals a lack of recognition by him of the duties of an attorney and of the obligation and respect due to the courts.

### Summary.

Our examination of the entire record reveals nothing of a serious nature warranting the imposition of discipline under the first ten counts, although it must be conceded in some instances petitioner's conduct is not to be commended. The evidence with respect to certain of those counts reflects a pattern of conduct that might give rise to doubt as to petitioner's honesty, which doubt we have resolved in his favor. How-

ever, as before indicated, his conduct with respect to the matter involved in count eleven requires discipline. The board having found against petitioner on nine counts recommended suspension for a period of two years. In view of the prior disciplinary action against him, his conduct with respect to the matter involved in count eleven justifies his suspension for a period of one year.

It is ordered that petitioner be suspended from the practice of law for a period of one year, effective thirty days after the filing of this opinion.

CARTER, J., Concurring and Dissenting.—I concur in the conclusion reached as to the first ten counts but I dissent from the holding in the majority opinion that petitioner should be disciplined for his conduct embraced in count 11. In my opinion the record does not disclose any attempt of petitioner to mislead the court or take an unfair advantage of the adverse party. No one was injured or suffered any loss as the result of petitioner's conduct. His explanation of what took place is as reasonable as that contended for by The State Bar, and even if we accept respondent's theory as to petitioner's conduct, it affords no justification for the extent of the discipline administered.

In my opinion the entire proceeding against petitioner should be dismissed.

Petitioner's application for a rehearing was denied August 9, 1945. Carter, J., voted for a rehearing.