53 Cal.Rptr.3d 357 (2007)
146 Cal.App.4th 914
Thomas SPIELBAUER, Plaintiff and Appellant,
v.
COUNTY OF SANTA CLARA et al., Defendants and Respondents.
No. H029345.
Court of Appeal of California, Sixth District.
January 12, 2007.
*359 Burnett, Burnett & Allen, Douglas B. Allen, San Jose, for Plaintiff and Appellant Thomas Spielbauer.
Office of the County counsel, Ann Miller Ravel, County Counsel, Marcy L. Berkman, Deputy County Counsel, for Defendants and Respondents County of Santa Clara et al.
*358 RUSHING, P.J.
Plaintiff Thomas Spielbauer was dismissed by his employer, defendant County of Santa Clara, on the grounds that he had engaged in conduct unbecoming a county employee by making deceptive statements to a judge, and had committed insubordination by refusing to answer questions about the incident on grounds that his answers might incriminate him. He brought this action in mandate to set aside that decision. The superior court denied relief, and plaintiff brought this appeal. We have concluded that the finding of insubordination cannot be sustained because a public agency cannot penalize one of its employees for refusing to answer incriminating questions unless the state first grants or offers immunity, i.e., a binding undertaking not to use his answers in any criminal prosecution. We will therefore reverse the judgment denying relief and direct that the matter be remanded to county authorities to determine the appropriate discipline based upon the one sustainable charge.

BACKGROUND
On January 27, 2003, plaintiff was counsel of record for one Michael Dignan, who was charged with possessing ammunition while a convicted felon. On that date plaintiff appeared before Judge Teilh, to whom the case had been assigned for trial, to argue certain motions in limine. Among these was a motion by the prosecutor to exclude extrajudicial statements by one Troy Boyd, who had been detained at the same time as Dignan, but not charged. Plaintiff confirmed that he intended to offer *360 into evidence Boyd's hearsay statement to police "that his parents owned the house" where the ammunition was found "and that he has been renting it since he was 19 years of age."
The apparent purpose of this evidence was to support a doubt in the jury's mind that Dignan had been in control of the area where the contraband ammunition was found. This strategy depended on the ambiguity and incompleteness of Boyd's reported statements. As he later said, he was renting the house from his parents but in turn subletting portions of it to others, including Dignan. The value of Boyd's statements, as viewed by the defense, thus lay in their failure to mention Dignan's own possessory interest, a fact that would presumably emerge if Boyd testified.
The prosecutor argued that Boyd's statements were inadmissible hearsay. He asserted that they could not come within any hearsay exception predicated on the unavailability of the declarant (i.e., Boyd) to testify, since there had been no evidence of any attempt by the defense to secure Boyd's attendance at trial. When Judge Teilh asked plaintiff what exception to the hearsay rule would permit the statements to come into evidence, plaintiff asserted that he had not sent an investigator to look for Boyd, in part because "Mr. Boyd has a warrant out for his arrest. And if the San Jose Police are not going to be able to find Mr. Boyd, I think that my investigator is going to be very hard put to find an individual who is avoiding contact with anybody that has to do with the judicial system." He presented an outstanding $5,000 warrant for Boyd, and contended that insofar as Boyd's unavailability as a witness was required to establish a hearsay exception, "the fact that there is a warrant out for Troy Boyd would meet that burden."
The prosecutor argued that plaintiffs "non-existen[t]" efforts to locate Boyd did not establish the "due diligence" necessary to establish a declarant's unavailability for hearsay purposes. Plaintiff replied that to exclude the statements would deprive Dignan of "a critical defense," i.e., doubts based on Boyd's possessory interest in the house, and that this would be unfair because Boyd was "a foggy, gray kind of witness who doesn't like to bewho's had problems with the law and avoids contact with any kind of authority figures...." After further argument, the court ruled that it would "allow those statements to come in as to the ownership of the house and his residence there."
Plaintiff then said he wanted the jury to be told that Troy Boyd had an outstanding arrest warrant or was a fugitive from justice. Otherwise, he argued, jurors might wonder, "Why didn't Mr. Dignan call Mr. Boyd?" The prosecutor replied that this was a "very good question" because "Mr. Spielbauer has acknowledged to this court that he's made zero effort to locate him." Plaintiff replied, "Well, I'd like to tell the jury why I have not. I'd like to tell the jury why, because he's got a warrant for his arrest and he's ducking [i.e., avoiding service of process]." He then expressed an intention to move the arrest warrant into evidence in order to "explain to the jury why Mr. Boyd is not here as a witness for Mr. Dignan."
Plaintiff did not inform the court that on the day before this hearing, he had spoken to the witness Boyd at the house in question. This fact emerged three days later, after a police sergeant went to the house and found Boyd there. Boyd told him that he had spoken to "a public defender investigator ...." When the prosecutor confronted plaintiff with this information, plaintiff said it had been he, not an investigator, who spoke with Boyd. Plaintiff then told the court that he had gone to the house to take photographs on Sunday, January *361 26, 2003; that he there found "a whole bunch of people watching the Super Bowl"; and that one of them "turned out to be Mr. Boyd." Plaintiff had not carried a subpoena, he said, because he had not expected to find Boyd there. He recounted a* conversation in which Boyd "told me that he would not cooperate in being served. He told me he did not want to inject himself into the legal system. He did not want to come to court. He did not want to testify." Plaintiff asserted that he had no obligation to tell the court on Monday that he had "bumped into" the witness on the day before. He offered the rationale that such a disclosure "calls into question basically what you would call the attorney work product."
The prosecutor contended that plaintiffs statements on January 27, 2003, constituted an "affirmative false misrepresentation [sic] ... to this Court," and that plaintiff had "injected himself as a witness into this case by attempting to frustrate the discovery of the truth." Without addressing this assertion, the court ruled that Boyd was in fact available as a witness and that this would be taken into account in ruling on any hearsay objection.[1]
In late February or early March, Chief Assistant Public Defender David Mann heard about the foregoing incident, and was told that the deputy district attorney in the Dignan matter "was getting transcripts from [that] case and was going to `go after' [plaintiff] in some fashion." Mann communicated with the office of the District Attorney, which in mid-March supplied a "packet of material" concerning plaintiffs statements to Judge Teilh. Officials there told him the office had not decided which of three options to pursue: "file a misdemeanor charge against [plaintiff] ...; report him to the State Bar; or leave it to us to handle." Mann decided not to wait for a decision by that office but to go ahead with an internal investigation. Lateraround the end of May 2003the office of the district attorney did file a misdemeanor complaint charging plaintiff with a deceit upon the court in violation of Business and Professions Code section 6128. Although the present record is incomplete on this point, plaintiff asserts that the action was ultimately dismissed by stipulation.
Meanwhile the public defender's office undertook its own investigation. The office first scheduled an interview between plaintiff and Joe Guzman, supervisor of the felony division, on March 26, 2003. That meeting was apparently not transcribed, but was continued to April 1, 2003, after plaintiff demanded, through counsel, an opportunity to review relevant documents plus citation of the authority on which the meeting was convened.
By the time of the continued meeting on April 1, 2003, if not before, a dispute had arisen over plaintiffs obligation to answer questions concerning the events in question. On that date a department investigator, Alayne Bolster, asked plaintiff to describe his meeting with the witness Troy Boyd. Plaintiffs attorney, Zacharias Ledet, interjected that plaintiff "declines to answer your question, relying on the advice of counsel and protection afforded to him under the Constitution of the State of California, the Constitution of the United States, and the Statutes and Laws of the State of California, the County of Santa Clara, and the United States of America." Guzman responded by addressing plaintiff: *362 "Tom, you have a right to remain silent and not incriminate yourself. Your silence, however, may be deemed insubordination, leading to administrative discipline up to and including termination. Any statement made during this interview cannot, and I emphasize cannot, be used against you in any subsequent criminal proceeding. Do you understand what I've just read to you?" In the ensuing exchange, plaintiffs counsel stated that the protection against penal use as described by Guzman "only applies to peace officers" and that the "advisement" read to plaintiff was thus "not on point and unless you receive a ruling from a Court of Law, that advisement could not cover Mr. Spielbauer...." Guzman then said, "I want to make clear that this is not a criminal proceeding. ... This is an employee investigation, okay. What we do here stays within the Public Defender's Office. This is not going to be sent over to the DA's Office, okay. What I'm saying is, ... anything you say at this meeting cannot be used against you in a criminal proceeding. So you are directed to answer the questions and your refusal to answer the questions will be deemed as insubordination." Guzman later stated that he was giving plaintiff "a direct order to answer all questions truthfully, candidly, and to the best of your ability." Later he reiterated these points: "I'm giving you a direct order to answer the questions. I'm also informing you that your refusal to answer all questions germane to this investigation will be regarded as insubordination which is a disciplinary offense that can lead to discipline up to and including termination.... [A]s it relates to your right to remain silent, and not incriminate yourself, you have a right not to answer the questions. That refusal may be deemed insubordination leading to administrative discipline.... Any statement made during this investigation cannot be used against you in any subsequent criminal proceeding." Plaintiff continued to object through Ledet.
Matters proceeded in much the same way at the continued meeting of April 10, 2003, except that Guzman no longer told plaintiff he had a right to remain silent, stating instead, "This is an employee-employer investigation so therefore you do not have a right to refuse to answer these questions. Should you refuse, you may be guilty or you will be guilty of insubordination, an offense that can and will lead to discipline up to and including termination. And any information that Tom provides in this particular interview cannot and will not be used against him in a criminal case. This is strictly internal, employee-employer related issues." Ledet stated that the office had provided "no authority for the[se] assurances" and that cases cited for them in correspondence were concerned only with peace officers. At the conclusion of the meeting he asserted that Guzman had exhausted his right to conduct such meetings under governing personnel policies and procedures and that "going any further would be unreasonable," adding that plaintiff would continue to invoke his rights not to answer.
On June 9, 2003, Mann recommended that plaintiffs employment be terminated on three grounds: (1) violation of a merit system rule authorizing discipline for "[r]efusal to accept a reasonable and proper assignment from an authorized supervisor; insubordination" (Santa Clara County Code (County Code), § A25-301, subd. (a)(5)); (2) violation of a merit system rule authorizing discipline for "gross misconduct, or conduct unbecoming a County officer or employee which tends to discredit the County or County service" (County Code, § A25-301, subd. (b)(1)); and (3) violation of a public defender's office ethical rule prohibiting any "member of the professional staff' from "seek[ing] to mislead *363 or deceive a judge, jury, or party by an artifice or false statement of fact or law...."
Plaintiff requested an administrative appeal, and a Skelly hearing was conducted by Assistant County Counsel Susan G. Levenberg. (See Skelly v. State Personnel Board (1975) 15 Cal.3d 194, 215, 124 Cal. Rptr. 14, 539 P.2d 774 (Shelly).) She sustained the recommended disciplinary action. Plaintiff appealed this ruling in turn to the County Personnel Board, which upheld the action, finding that plaintiff made false and misleading statements to Judge Teilh; that he did so in a deliberate attempt to mislead the court; that this violated the public defender's written policies and constituted unbecoming conduct and thus cause for dismissal under county merit system rules; and that plaintiffs refusal to answer questions during the three investigational meetings constituted a refusal to accept a reasonable and proper assignment, i.e., insubordination under merit system rules.
Plaintiff then commenced this action for a writ of mandate or administrative mandate. In a lengthy written decision, the trial court ruled that plaintiff had received a fair hearing, that the decision to terminate his employment was not an abuse of discretion, and that it was supported by substantial evidence. The court rejected plaintiffs argument that he had to receive a grant of immunity before he could be punished for refusing to answer potentially incriminating questions. The court entered judgment for defendant, and denied plaintiffs motion for new trial. Plaintiff filed this timely appeal.

Discussion

I. Standard of Review

Plaintiff contends that in reviewing the trial court's denial of his writ petition, this court must apply its independent judgment. Defendant disagrees, stating that while the trial court was obliged to apply its independent judgmentand did so this court's assessment must be guided by the substantial evidence test.
Plaintiff is of course correct in stating that this court must exercise its independent judgment in reviewing the trial court's determinations on questions of law. (Anserv Insurance Services, Inc. v. Kelso (2000) 83 Cal.App.4th 197, 204, 99 Cal. Rptr.2d 357.) But he is mistaken in suggesting that this court exercises its independent judgment on questions of fact. He cites Strumsky v. San Diego County Employees Retirement Assn. (1974) 11 Cal.3d 28, 112 Cal.Rptr. 805, 520 P.2d 29, for the proposition that review of a "vested property right" is a "question[] of de novo review by this Court...." That case does not contain the stated proposition. The court there was not concerned with the standard of appellate review at all; the sole question was the standard to be applied in the trial court. (See id. at p. 32, 112 Cal.Rptr. 805, 520 P.2d 29.)
Although plaintiff sought relief in both traditional mandate (Code Civ. Proc., § 1086) and administrative mandamus (Code Civ. Proc., § 1094.5 (section 1094.5)), he does not dispute the trial court's determination that the case sounds in administrative mandamus. Section 1094.5 governs any "inquiry into the validity of any final administrative order or decision made as the result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken, and discretion in the determination of facts is vested in the inferior tribunal, corporation, board, or officer" (Code Civ. Proc., § 1094.5, subd. (a)), sets out two alternative standards of review for factual findings: "[I]n cases in which the court is authorized by law to exercise its independent *364 judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence. In all other cases, abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record." (Code Civ. Proc., § 1094.5, subd. (c).)
It is undisputed that the termination of plaintiffs employment was subject to review under the weight of the evidence standard because it substantially affects a fundamental right. (Bixby v. Pierno (1971) 4 Cal.3d 130, 143, 93 Cal.Rptr. 234, 481 P.2d 242; see Valenzuela v. Board of Civil Service Comrs. (1974) 40 Cal.App.3d 557, 565, 115 Cal.Rptr. 103 [termination of permanent classified civil service employment with city affected fundamental right so as to be subject to independent judgment review]; Skelly, supra, 15 Cal.3d at p. 206, 124 Cal.Rptr. 14, 539 P.2d 774 [permanent employee in state civil service has "a property interest in continuation of his employment which is protected by due process"].) However, that standard governs only the trial court's assessment of the evidence; a reviewing court must apply the substantial, evidence test, sustaining every finding of fact that is supported by substantial evidence, whether or not the evidence might also have supported a contrary finding. (See Fukuda v. City of Angels (1999) 20 Cal.4th 805, 824, 85 Cal. Rptr.2d 696, 977 P.2d 693.)
We will therefore review questions of law independently, while deferring to the trial court's findings on questions of fact.

II. Insubordination

A. Introduction

The Board found that plaintiff was guilty of insubordination because, relying on his privilege against self-incrimination, he refused to answer questions by his supervisor, Guzman, about the incident at issue. Plaintiff contends that this finding is insupportable as a matter of law because he could not lawfully be required to answer questions about the incident at issue, or disciplined for refusing; to do so, without first being granted immunity against criminal prosecution. This contention has merit. As will appear, the United States Supreme Court has declared that the prohibition against officially compelled self-incrimination extends to a state's attempts to compel a public employee, through threats of discipline, to answer potentially incriminating questions. A public employee can be disciplined for refusing to answer such questions only if he was first granted immunity against the use of his statements, or any evidence derived from them, in any criminal case against him. Some California cases have abrogated this ruleinadvertently, as it appearsby conflating it with a separate and distinct remedial rule excluding from any criminal trial statements the defendant was compelled to make in violation of his privilege against self-incrimination, and evidence derived from such statements. The combining of these two distinct rules by judicial fiat is not only contrary to paramount federal authority, but logically insupportable; moreover, it imperils other official interests which more circumspect California decisions have taken great pains to accommodate. Foremost among these is the enforcement of the criminal laws, which may be impeded and even stymied by the defendant's having been compelled before trial to make incriminating disclosures. For these reasons, as elaborated below, we will hold that in the absence of a formal grant of immunity, which defendant apparently had no power to make, plaintiff could not be guilty of insubordination for failing to answer incriminating questions.

*365 B. Privilege Against Compelled Self-Incrimination in Public Employment

The Fifth Amendment declares that "[n]o person ... shall be compelled in any criminal case to be a witness against himself...." (U.S. Const., amend. 5; see Cal. Const., art. I, § 15 ["Persons may not ... be compelled in a criminal cause to be a witness against themselves...."].) This right "not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." (Lefkowitz v. Turley (1973) 414 U.S. 70, 77, 94 S.Ct. 316, 38 L.Ed.2d 274 (Turley); see Kastigar v. United States (1972) 406 U.S. 441, 444-445, 92 S.Ct. 1653, 32 L.Ed.2d 212 (Kastigar), fns. omitted ["The privilege ... can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory; and it protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used"].)
Here it is not disputed that at least some of the questions directed to plaintiff by his superiors had the potential to support a criminal prosecution against him. Indeed, such a prosecution was under active consideration throughout the time the public defender's office was investigating the incident and attempting to compel answers from plaintiff. The question then is whether plaintiff could be compelled to answer, or disciplined for refusing to do so, despite the incriminating potential of his answers.
The basic rule is that "a witness protected by the privilege may rightfully refuse to answer unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant." (Turley, supra, 414 U.S. at p. 78, 94 S.Ct. 316, italics added, citing Kastigar, supra, 406 U.S. 441, 92 S.Ct. 1653.)[2] The state cannot lawfully penalize him for such refusal without first affording him such protection. (Lefkowitz v. Cunningham (1977) 431 U.S. 801, 805, 97 S.Ct. 2132, 53 L.Ed.2d 1 (Cunningham) ["[A] State may not impose substantial penalties because a witness elects to exercise his Fifth Amendment right not to give incriminating testimony against himself"].)
This prohibition extends to demands for information by the state in its role as employer. Thus a state agency cannot compel its employees to answer incriminating questions over a Fifth Amendment objection unless it first grants them protection against the use of their compelled answers, and evidence derived from those answers, in any later criminal *366 prosecution. (Turley, supra, 414 U.S. 70, 94 S.Ct. 316 [contractor with state could not be penalized by loss of state business for refusing to waive Fifth Amendment privilege in grand jury proceeding]; Gardner v. Broderick (1968) 392 U.S. 273; 88 S.Ct. 1913, 20 L.Ed.2d 1082 [police officer could not be discharged for refusing to waive privilege and testify before grand jury without protection against subsequent prosecution]; Sanitation Men v. Sanitation Comm'r (1968) 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (Sanitation Men) [city could not discharge workers for refusing to answer questions or for refusing to waive privilege].)
The ultimate aim of the amendment, however, is only to protect individuals against the use of their compelled disclosures to convict them of crime. It does not protect from other adverse effects of disclosure. Thus an interrogatee can be compelled to answer, and punished for refusing to do so, if he is granted adequate protection against the penal use of his statements. (Turley, supra, 414 U.S. at p. 84, 94 S.Ct. 316 ["Although due regard for the Fifth Amendment forbids the State to compel incriminating answers from its employees and contractors that may be used against them in criminal proceedings, the Constitution permits that very testimony to be compelled if neither it nor its fruits are available for such use."]; see Chavez v. Martinez (2003) 538 U.S. 760, 768, 123 S.Ct. 1994, 155 L.Ed.2d 984["[W]e have long permitted the compulsion of incriminating testimony so long as those statements (or evidence derived from those statements) cannot be used against the speaker in any criminal case"]; Ullmann v. United States (1956) 350 U.S. 422, 431, 76 S.Ct. 497, 100 L.Ed. 511, quoting Hale v. Henkel (1906) 201 U.S. 43, 67, 26 S.Ct. 370, 50 L.Ed. 652 ["`[I]f the criminality has already been taken away, the Amendment ceases to apply'"].)[3] Moreover, once he is lawfully compelled to answer, his disclosures may furnish grounds for imposing adverse consequences, provided they are not penal in nature. (See Blackburn v. Superior Court, supra, 21 Cal.App.4th at p. 426, 27 Cal.Rptr.2d 204 ["Whereas the Fifth Amendment privilege may be invoked by a civil litigant [citation], it does not provide for protection against civil penalties"]; Segretti v. State Bar (1976) 15 Cal.3d 878, 886-887, 126 Cal.Rptr. 793, 544 P.2d 929 [immunized testimony was properly considered in disciplinary proceedings against attorney].) Thus if a public employee is protected from self-incrimination in the manner contemplated by these cases, his compelled answers may form the basis for discipline, as may his continuing refusal to answer.
In sum, the state cannot compel any person, including one of its employees, to furnish information that may contribute to the imposition of criminal penalties on that person. If the threat of criminal penalties has been removed, however, the state can require the person to answer, and if the *367 answers furnish grounds for other adverse actions, the erstwhile risk of incrimination poses no impediment to those actions.

C. Immunity and the Exclusionary Rule

The foregoing cases stand for the rule that the state cannot compel a public employee to answer incriminating questions "unless and until he is protected" against the use of his answers to make a criminal case against him. (Turley, supra, 414 U.S. at p. 78, 94 S.Ct. 316.) In the absence of such protection, the interrogatee is "privilege[d]" to stand mute without fear of punishment for his refusal to answer.[4] (Id. at p. 77, 94 S.Ct. 316; see Cunningham, supra, 431 U.S. at p. 805, 97 S.Ct. 2132.) The protection contemplated by these cases is a grant of immunity, i.e., an undertaking by the state not to use the answers to prosecute. (Cunningham, supra, at p. 806, 97 S.Ct. 2132 ["[G]overnment cannot penalize assertion of the constitutional privilege against compelled self-incrimination by imposing sanctions to compel testimony which has not been immunized"]; Turley, supra, at p. 85, 94 S.Ct. 316, italics added ["if answers are to be required in such circumstances [i.e., on pain of discharge] States must offer to the witness whatever immunity is required to supplant the privilege and may not insist that the employee or contractor waive such immunity"]; Chavez v. Martinez, supra, 538 U.S. at pp. 770-771, 123 S.Ct. 1994, italics added [among the "prophylactic rules" adopted under the Fifth Amendment is "an evidentiary privilege that protects witnesses from being forced to give incriminating testimony, even in noncriminal cases, unless that testimony has been immunized ... before it is compelled"]; id. at p. 771, 123 S.Ct. 1994, italics added [interrogatee is entitled "to insist on an immunity agreement before being compelled to give incriminating testimony in a noncriminal case"]; Stevens v. Marks (1966) 383 U.S. 234, 246, 86 S.Ct. 788, 15 L.Ed.2d 724, fn. omitted ["A witness has ... a constitutional right to stand on the privilege against self-incrimination until it has been fairly demonstrated to him that an immunity, as broad in scope as the privilege it replaces, is available and applicable to him."]; see Baxter v. Palmigiano, supra, 425 U.S. 308, 318, 96 S.Ct. 1551, italics added [drawing adverse inference from inmate's silence in prison disciplinary proceeding "does not smack of an invalid attempt by the State to compel testimony without granting immunity or to penalize the exercise of the privilege"].)
This privilege to stand mute must be distinguished from a second rule of federal constitutional law, which arises after an individual has been unlawfully compelled to answer incriminating questions. Under this rule, when a compulsion to answer violates the interrogatee's right to remain silent, he may object to the admission of his answers, or any evidence derived from them, in any criminal action brought against him. Thus if a public employee is compelled to answer incriminating questions under a threat of dismissal, his responses will be excluded from a subsequent criminal prosecution. (Garrity v. New Jersey (1967) 385 U.S. 493, 500, 87 S.Ct. 616, 17 L.Ed.2d 562 (Garrity); Turley, *368 supra, 414 U.S. at pp. 78, 80, 94 S.Ct. 316.) This exclusionary rule is a remedial device predicated upon an unlawful violation of the interrogational privilege.
The governing federal cases clearly reflect the distinction between immunity required for a state to lawfully compel answers, and the right to exclude answers that are unlawfully compelled. (Turley, supra, at p. 78, 94 S.Ct. 316, italics added, citations omitted ["[A] witness protected by the privilege may rightfully refuse to answer unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant.... Absent such protection, if he is nevertheless compelled to answer, his answers are inadmissible against him in a later criminal prosecution"]; Garner v. United States (1976) 424 U.S. 648, 653, 96 S.Ct. 1178, 47 L.Ed.2d 370, italics added ["the [Fifth Amendment] privilege protects against the use of compelled statements as well as guarantees the right to remain silent absent immunity"].) The Supreme Court has acknowledged that the two principles are in some respects "coextensive." (Chavez v. Martinez, supra, 538 U.S. at pp. 769-770, 123 S.Ct. 1994.) However, it has steadfastly refused to fuse them into a single rule.
In Maness v. Meyers (1975) 419 U.S. 449, 95 S.Ct. 584, 42 L.Ed.2d 574, an attorney was held in contempt for advising his client, the defendant in a civil obscenity trial, not to comply, on self-incrimination grounds, with the city attorney's subpoena demanding production of certain magazines. In addition to assurances that he had no intention of prosecuting, the city attorney argued that the defendant was "amply protected" against self-incrimination "because in any ensuing criminal action he could always move to suppress, or object on Fifth Amendment grounds to the introduction of the magazines into evidence." (Id. at pp. 461-462, 95 S.Ct. 584, fn. omitted.) The Supreme Court rejected this view: "Laying to one side possible waiver problems that might arise if the witness followed that course, [citation], we nevertheless cannot conclude that it would afford adequate protection. Without something more `he would be compelled to surrender the very protection which the privilege is designed to guarantee.' [Citation.]" (Id. at p. 462, 95 S.Ct. 584, fn. omitted.) In a footnote, the court explained what it meant by "something more": "It is important here that the witness was not granted immunity from prosecution on the basis of any magazines he might produce.... [¶] Had the witness been granted formal immunity a different case would be presented; in that event a witness may be compelled to testify." (Id. at p. 462, fn. 10, 95 S.Ct. 584, italics added, citing Kastigar, supra, 406 U.S. 441, 92 S.Ct. 1653.)
Eighteen years later the court again rejected a contention that the anticipated exclusion of statements at a future criminal trial justifies their compulsion in a noncriminal setting. In Pillsbury Co. v. Conboy (1983) 459 U.S. 248, 103 S.Ct. 608, 74 L.Ed.2d 430, a deponent in a civil case was held in contempt for refusing to answer questions that closely tracked questions he had already answered under a grant of federal statutory immunity. In addition to noting that federal courts lack the power to confer immunity other than as authorized by statute, the court rejected the idea that a trial court could or should base such a ruling on forecasting the determination to be made in a later criminal trial. (Id. at p. 261, 103 S.Ct. 608.) In holding the deponent in contempt, the trial court had "essentially predicted that a court in a[] future criminal prosecution ... w[ould] be obligated to protect against evidentiary *369 use of the deposition testimony petitioners seek. We do not think such a predictive judgment is enough." (Ibid.) Arguments to the contrary "impose[d] risks on the deponent whether or not the deposition testimony properly can be used against him in a subsequent criminal prosecution." (Id. at p. 262, 103 S.Ct. 608, fn. omitted.) The trial court's order of compulsion could not be "justified by the subsequent exclusion of the compelled testimony." (Ibid.)
The court again rejected such an argument in United States v. Doe (1984) 465 U.S. 605, 609-610, 104 S.Ct. 1237, 79 L.Ed.2d 552, where the government asserted that a subpoena should be enforced over a Fifth Amendment objection, despite a lack of formal immunity, "because of the Government's offer not to use respondent's act of production against respondent in any way." The court refused to adopt "a doctrine of constructive use immunity," under which "the courts would impose a requirement on the Government not to use the incriminatory aspects of the act of production against the person claiming the privilege even though the statutory procedures have not been followed." (Id. at p. 616,104 S.Ct. 1237.) The court "decline[d] to extend the jurisdiction of courts to include prospective grants of use immunity in the absence of the formal request that the [governing] statute requires." (Ibid., fn. omitted; see Matter of Special Federal Grand Jury Empanelled Oct. 31, 1985 (3d Cir.1987) 819 F.2d 56, 59 [rejecting argument that immunity was unnecessary to overcome a Fifth Amendment objection because incriminating disclosures "would not be admissible because they could be suppressed"; argument was "but a recasting of the constructive use immunity contention rejected in Doe"].)
In sum, federal cases contemplate two distinct shields, which become available at different stages of a prospective or actual prosecution. The first arises in any official interrogation, and entitles the interrogatee to refuse to answer incriminating questions unless immunity is granted. The second arises at the time of a criminal trial, and entitles the defendant to exclude from evidence any incriminating statement, or evidence derived from a statement, that was extracted in violation of the first privilege. The interrogational privilege preserves the right to remain silent; the exclusionary rule remedies a breach of that right. These rights coexist because any attempt to compel incriminating disclosures places the interrogatee "`between the rock and the whirlpool.'" (Stevens v. Marks, supra, 383 U.S. at p. 243, 86 S.Ct. 788.) He is entitled to resist threats of punishment for his exercise of the right to remain silent, but he may be excused if instead he succumbs. (Ibid.; Garrity, supra, 385 U.S. at p. 498, 87 S.Ct. 616.) In either case the law strives to vindicate his right to remain silent-in the first situation by setting aside any adverse consequences visited upon him for standing mute, and in the second by excluding from evidence his wrongfully compelled statements, and any evidence derived from them. The first right is preservative and protective; the second, restorative and remedial.
Here, when plaintiffs supervisor sought to question him in a potentially incriminating manner, plaintiff asserted his right to remain silent, and the supervisor told him he must answer or subject himself to discipline, including discharge, for insubordination. Although the supervisor stated that plaintiffs answers could not be admitted in a criminal prosecutionan apparent allusion to the rule of exclusionhe never granted or offered immunity. Under the foregoing authorities, the failure to offer immunity was fatal to any attempt to discipline plaintiff for remaining silent. It follows that the Board's finding of insubordination cannot survive.

*370 D. Conflation of Federal Protections in California Cases

The relatively straightforward analysis set forth above conflicts with several California decisions that have failed to note the dual nature of the federal protection and the need for an offer or grant of immunity as a predicate for lawfully compelled answers. Defendant contends that these cases permitted it to compel answers from plaintiff without such a grant, so long as it told him that his answers could not be used to incriminate him. Defendant cites Kelly v. State Personnel Board (1979) 94 Cal.App.3d 905, 911, 156 Cal.Rptr. 795 (Kelly), where a criminalist challenged his dismissal from state service for failing to comply with his employer's request for information concerning his alleged mishandling of controlled substances.[5] He contended that the dismissal violated his rights to free association and privacy. (Kelly, supra, 94 Cal.App.3d at p. 911, 156 Cal.Rptr. 795.) After acknowledging that it was "not concerned with plaintiffs right against self-incrimination," the court went on to state, "[A] public employee may be required to answer questions relative to his fitness for his employment if his answers cannot be used against him in a subsequent criminal proceeding. (See Lefkowitz v. Turley (1973) 414 U.S. 70, 77[, 94 S.Ct. 316, 38 L.Ed.2d 274], ...) If the employee still refuses to answer questions relevant to his official duties then he may be dismissed. (Szmaciarz v. State Personnel Bd. (1978) 79 Cal.App.3d 904, 918, 145 Cal.Rptr. 396.)" (Ibid.) But Turley does not say that an employee may be compelled to answer whenever his answers cannot be used against him. It says he can be compelled to answer when granted immunity coextensive with the privilege.
A similar misapprehension appears in Szmaciarz v. State Personnel Bd., supra, 79 Cal.App.3d 904, 918, 145 Cal.Rptr. 396 (Szmaciarz), on which Kelly relied. That case upheld the dismissal of a prison guard based in part on admissions he made under interrogation after being "advised he would be required to answer the questions and take a polygraph test or he would automatically be dismissed." (Szmaciarz, supra, 79 Cal.App.3d at p. 909, 145 Cal. Rptr. 396.) At an ensuing hearing the guard attempted to assert a Fifth Amendment privilege, but answered questions "`under protest'" after being allowed 10 minutes to reconsider. (Id. at p. 910, 145 Cal.Rptr. 396.) Without acknowledging the rule set out five years earlier in Turley, the court declared that "the Department was justified" in "advising" the guard that "if he refused to answer the questions or to submit to a polygraph, he would be dismissed" (id. at p. 916, 145 Cal.Rptr. 396), and that he was properly compelled to testify at the hearing because "if a peace officer refuses to answer questions posed regarding his official duties, he may be dismissed." (Id. at p. 918, 145 Cal. Rptr. 396.)
The court extracted this supposed rule from Garner v. United States, supra, 42A U.S. 648, 96 S.Ct. 1178, where the court held that the Fifth Amendment was not *371 violated by required disclosures on tax returns where the taxpayer complied with the requirement rather than asserting the privilege. In the passage quoted in Szmaciarz, supra, 79 Cal.App.3d at page 918, 145 Cal.Rptr. 396, the high court wrote: "Unless the government seeks testimony that will subject its giver to criminal liability, the constitutional right to remain silent absent immunity does not arise. An individual therefore properly may be compelled to give testimony, for example, in a noncriminal investigation of himself." (Garner v. United States, supra, 424 U.S. at p. 655, 96 S.Ct. 1178.) The court in Szmaciarz evidently read this to mean that there is no right to remain silent in a "noncriminal investigation." But that is obviously not its purport, since such a rule would contradict the very well settled rule, noted above, that the privilege may be asserted in any proceeding where incriminating answers are sought to be compelled. The actual gist of the quoted passage was that in noncriminal matters, an individual must ordinarily assert a "claim of privilege," i.e., must invoke the right to remain silent, in order to stand on it. This is not true in a criminal case, where the defendant has an "absolute right not to be called as a witness and not to testify." (Cramer v. Tyars (1979) 23 Cal.3d 131, 137, 151 Cal.Rptr. 653, 588 P.2d 793.) In any other context, a witness may fairly be compelled to answer questions unless and until an issue of self-incrimination is openly raised. A witness in a "noncriminal" setting must do something to invoke the privilege in order to put in issue his presumptive obligation to answer. This, and not an implied overruling of the massive body of case law we have cited, is the intent of the passage quoted in Szmaciarz.
The court also attempted to distinguish Gardner v. Broderick, supra, 392 U.S. 273, 88 S.Ct. 1913, on the ground that the police officer there was not only ordered to answer but also to "waive the immunity to which he was entitled...." (Szmaciarz, supra, 79 Cal.App.3d at p. 918, fn. 6, 145 Cal.Rptr. 396.) The court read Gardner to hold that the officer "could not be dismissed for failing to waive immunity although he could be dismissed for refusing to answer questions relating to the performance of his official duties." (Ibid.) If Gardner stood alone as the last word on the subject, it might be susceptible to such a narrow reading. (But see Gardner, supra, at p. 276, 88 S.Ct. 1913, italics added ["Answers may be compelled regardless of the privilege if there is immunity from federal and state use of the compelled testimony or its fruits"].)
However Gardner neither stood alone nor provided the last word, and the narrow reading it receives in Szmaciarz is incompatible with two decisions not cited there. It was decided simultaneously with Sanitation Men, supra, 392 U.S. 280, 88 S.Ct. 1917, where 15 workers complained of being discharged in violation of their Fifth Amendment rights. Three had refused to sign waivers of immunity, and so might come within the narrow rule posited in Szmaciarz. But 12 of the workers had been discharged before they were asked to sign anything, solely for refusing to testify before a commissioner. (Id. at pp. 281-282, 88 S.Ct. 1917.) The Supreme Court made no distinction between these two groups; the rights of all 15 had been violated. Also overlooked in Szmaciarz was Turley, supra, 414 U.S. 70, 94 S.Ct. 316, where the court repeatedly referred to "immunity" as a prerequisite to any compelled disclosure of potentially incriminating information. (See id. at p. 79, 94 S.Ct. 316 [where testimony is sought from third party witness in criminal case, "the price for incriminating answers ... is sufficient immunity to satisfy the imperatives of the Fifth Amendment privilege against *372 compelled self-incrimination"]; id. at p. 81, 94 S.Ct. 316 ["Immunity is required if there is to be `rational accommodation between the imperatives of the privilege and the legitimate demands of government to compel citizens to testify"]; id. at p. 82, 94 S.Ct. 316 [state "intended to accomplish what Garrity specifically prohibitedto compel testimony that had not been immunized"].)
In Lybarger v. City of Los Angeles (1985) 40 Cal.3d 822:, 221 Cal.Rptr. 529, 710 P.2d 329 (Lybarger), our own Supreme Court failed to note the critical role of immunity as a prerequisite to compelled disclosures. There a police officer refused to answer questions put to him during an internal departmental investigation into alleged misconduct. His interrogators told him "that a criminal investigation was pending, and that if [he] refused to cooperate in this administrative interview, he could be charged with insubordination and could lose his job." (Id. at p. 825, 221 Cal.Rptr. 529, 710 P.2d 329.) After conferring with counsel he refused to cooperate. (Id. at p. 825, 221 Cal.Rptr. 529, 710 P.2d 329.) He was ultimately discharged for insubordination. (Id. at p. 826, 221 Cal. Rptr. 529, 710 P.2d 329.) He contended that this violated his rights under the Public Safety Officers Procedural Bill of Rights Act (Gov.Code, § 3300 et seq.), and specifically Government Code section 3304, subdivision (a), which prohibits punitive action against a public safety officer for exercising his rights under the act. He contended that his refusal to answer questions was an exercise of rights protected by the act.
The court reversed, but not on the ground urged by the officer. Instead it held that his interrogators had not complied with the statutory requirement that a public safety officer be "informed of his constitutional rights" once it is "deemed" that he may be charged with a criminal offense. (Former Gov.Code, § 3303, subd. (g); see now Gov.Code, 3303, subd. (h).) The noncompliance consisted of their failure to tell him that "any statement made under the compulsion of the threat of ... discipline could not be used against him in any subsequent criminal proceeding." (Lybarger, supra, 40 Cal.3d at p. 829, 221 Cal.Rptr. 529, 710 P.2d 329.) The decision to dismiss him had to be annulled because, had he been informed of that right, he might have elected to cooperate rather than refusing to answer questions. (Id. at pp. 825, 830, 221 Cal.Rptr. 529, 710 P.2d 329.)
The decision's primary pertinence here is its statement that the officer had no constitutional right to remain silent because "his self-incrimination rights are deemed adequately protected by precluding any use of his statements at a subsequent criminal proceeding. (See Lefkowitz v. Turley (1973) 414 U.S. 70[, 94 S.Ct. 316, 38 L.Ed.2d 274], ...; Garrity v. State of New Jersey (1967) 385 U.S. 493, 500[, 87 S.Ct. 616, 17 L.Ed.2d 562], ...)" (Lybarger, supra, 40 Cal.3d at p. 827, 221 Cal. Rptr. 529, 710 P.2d 329.) We are unable to read either of those cases to "deem" the operation of the exclusionary rule at a future criminal trial an adequate basis to compel an interrogatee to answer incriminating questions. On the contrary, they both stand for the interrogatee's right to insist on immunity as a precondition for any such compulsion. Although the term "immunity" never appears in Lybarger, it appears 26 times in Turley, and the court there described Garrity as "specifically prohibit[ing]" the employer-state "from compel[ling] testimony that had not been immunized." (Turley, supra, 414 U.S. at p. 82, 94 S.Ct. 316, italics added; see id. at p. 84, 94 S.Ct. 316, italics added ["the accommodation between the interest of the State and the Fifth Amendment requires *373 that the State have means at its disposal to secure testimony if immunity is supplied and testimony is still refused"]; id. at pp. 85-86, 94 S.Ct. 316, italics added ["given adequate immunity, the State may plainly insist that employees either answer questions under oath about the performance of their job or suffer the loss of employment"]; id. at p. 85, 94 S.Ct. 316, italics added ["if answers are to be required in such circumstances States must offer to the witness whatever immunity is required to supplant the privilege and may not insist that the employee or contractor waive such immunity"].)
As we have said, the federal high court has directly repudiated the suggestion that the anticipated operation of the exclusionary rule supplies a substitute for a grant of immunity, justifying a compulsion to answer. (Maness v. Meyers, supra, 419 U.S. 449, 461-462, 95 S.Ct. 584, 42 L.Ed.2d 574; Pillsbury v. Conboy, supra, 459 U.S. 248, 261-262, 103 S.Ct. 608, 74 L.Ed.2d 430; United States v. Doe, supra, 465 U.S. at pp. 609-610, 616, 104 S.Ct. 1237.) Indeed, Justice White concurred separately in Maness v. Meyers, supra, 419 U.S. at page 475, 95 S.Ct. 584, to express a view similar to the one attributed to Turley and Garrity in Lybarger, i.e. that because answers made under compulsion after an assertion of the right to remain silent will be inadmissible in any criminal prosecution, a refusal to answer may be punished as contempt. He concurred in the result only because the state had failed to clearly acknowledge this restriction on use. (Id. at pp. 475-476, 103 S.Ct. 864.) Even Justice White, however, acknowledged that Turley contemplated "formal immunity protections." (Id. at p. 475, 103 S.Ct. 864.) The court's refusal to embrace his departure from that requirement must also stand as a repudiation of the rule attributed to the federal cases in Lybarger.
We are of course constrained to follow the holdings of the California Supreme Court. (Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455, 20 Cal.Rptr. 321, 369 P.2d 937.) The actual holding of Lybarger is that the officer's interrogation violated a statute requiring that public safety officers be advised of their constitutional rights. The court construed the statute to require advisement of the exclusionary rule we have described, i.e., the right to exclude from evidence in any future prosecution the answers he was compelled to give. The statute at issue there has no bearing on the case before us, since plaintiff is not a public safety officer.
At the same time, it does not appear that any issue of the interrogational privilegethe right to stand mute absent a grant of immunitywas argued to or considered by the court in Lybarger. "`It is axiomatic that cases are not authority for propositions not considered.' [Citation.]" (In re Marriage of Cornejo (1996) 13 Cal.4th 381, 388, 53 Cal.Rptr.2d 81, 916 P.2d 476.) The court's statement that the officer had no right to remain silent was dictum and as such is not binding precedent. (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 945, pp. 986-988, and cases cited.) Of course, as a lower court we are accustomed to placing great weight on the dicta of the Supreme Court and continually look to them for guidance. (See Dyer v. Superior Court (1997) 56 Cal.App.4th 61, 67, 65 Cal.Rptr.2d 85, citations omitted ["[A] dictum of the Supreme Court `"while not controlling authority, carries persuasive weight and should be followed where it demonstrates a thorough analysis of the issue or reflects compelling logic."'"].) In this instance, however, we are unable to reconcile the dictum with paramount federal authority, which plainly declares that a public employee cannot be compelled to give incriminating answers *374 until after he has received a grant of immunity.
In addition to its divergence from federal law, reliance on the exclusionary rule as a substitute for interrogational immunity suffers from a severe logical difficulty, which is that it generates a classic paradox. The exclusionary rule is premised upon the supposition that the answers sought to be excluded were obtained unlawfully, i.e., were compelled in violation of the interrogatee's right to remain silent. (See Garrity, supra, 385 U.S. at p. 500, 87 S.Ct. 616 [statements made under threat of removal from office are inadmissible at criminal trial because "coerced" for Fifth Amendment purposes].) But Lybarger relies on the future operation of the exclusionary rule to justify, i.e., make lawful, a present compulsion to answer. If the compulsion to answer is lawful, the predicate for the exclusionary rule disappears, and the answers may be introduced in a criminal trial. But if the answers will be admissible in a criminal trial, the employee cannot be compelled to give them.
The approach taken in the foregoing California cases thus propounds a paradox worthy of the Cretan philosopher Epimenides, to whom is attributed the statement, "All Cretans are liars." This is the Epimenidean Paradox, or more generically, the Liar's Paradox, often stated as, "I am a liar" or, less ambiguously, "I always lie," or "I never tell the truth." Such a statement produces an endlessly oscillating cycle of self-contradiction, because it cannot be declared true without making itself false, which in turn makes it true, again making it false, ad infinitum. Here, the federal exclusionary rule bars from evidence a statement that has been unlawfully compelled; but Lybarger relies on this prospective exclusion to make the compulsion lawful, a result which (if sound) would prevent operation of the exclusionary rule, which would (again) make the compulsion unlawful, ad infinitum.
Here the United States Supreme Court has squarely held, not once but repeatedly, that the* Fifth Amendment privilege deflects any official compulsion to answer incriminating questions until after immunity has been granted. We decline to perpetuate the supposition, which we consider erroneous, that this rule has been superseded by the federal exclusionary rule that remedies an unlawful abridgement of the right to remain silent.[6]

*375 E. Judicially Propounded Self-Executing Immunity

The paradox generated by Lybarger could be resolved by creating, under state law, a new form of immunity attaching to answers compelled from public employees, or some of them, by threat of discharge.[7] Under such a regime, whenever a public employer instructed an employee to answer incriminating questions or suffer discipline for refusing to do so, an immunity would automatically arise with respect to any answers the employee might give. In People v. Gwillim (1990) 223 Cal.App.3d 1254, 274 Cal.Rptr. 415 (Gwillim), this court interpreted Lybarger itself to create just such a scheme, at least with respect to police officers. In Gwillim, an officer was interrogated by internal affairs investigators concerning accusations that he had sexually assaulted a fellow officer. The interrogating officers read him a departmental "`Grant of Immunity Admonition,'" drafted under the influence of Lybarger, warning that if he refused to "make a statement," he would be "subject to discipline, including dismissal"; that any answers he gave would be "held confidential consistent with Penal Code section 832.7, and will not be divulged except as required by law"; that his answers might nonetheless be used against him "in relation to departmental charges"; and that any statements he made "under the compulsion or threats of such discipline" could not be used against him "in any subsequent criminal proceedings." (Id. at p. 1259, 274 Cal.Rptr. 415, fn. omitted.)
This court treated the foregoing procedure as cloaking the officer's answers with *376 what we called "Lybarger immunity." (Gwillim, supra, 223 Cal.App.3d at pp. 1263, 1270, 274 Cal.Rptr. 415; see id. at p. 1258, 274 Cal.Rptr. 415 [officer's answers were "a confidential statement under a grant of use immunity"].) The principal issue was whether i;he trial court had properly dismissed a criminal case against the accused officer on the ground that it was improperly "taint[ed]" by the "immunized statement." (Id. at pp. 1258, 1270-1273, 274 Cal.Rptr. 415.) The decision is relevant here chiefly for its recognition that federal authorities do not permit a public employer to punish an employee for refusing to answer incriminating questions unless he has received a grant of immunity. Gwillim rescued Lybarger from its seeming incompatibility with this rule by reading it to create, as a matter of state law, an immunity arising automatically whenever a police department orders one of its officers to respond to incriminating questions while admonishing him that refusal to answer may lead to discipline and that his answers cannot be used to prosecute him.
This reading of the Lybarger dictum has the comparative virtue of conforming to federal constitutional authority, but is unsatisfactory for a number of reasons.[8] First, the court in Lybarger had no apparent intention of creating a new rule of immunity. It never mentioned "immunity" and never acknowledged any requirement that immunity be conferred. Therefore Gwillim, while valiantly trying to save the dictum in Lybarger, does so by attributing an intent that the court showed no sign of entertaining.
Further, we think it highly unlikely that the California Supreme Court, after due circumspection, would adopt an automatic, judicially declared but extrajudicially conferred immunity of the type posited in Gwillim. When the Supreme Court has squarely addressed issues of Fifth Amendment immunity, it has exhibited an ever-increasing sensitivity to the legislative and prosecutorial prerogatives potentially impaired by such immunity. (See Byers v. Justice Court (1969) 71 Cal.2d 1039, 80 Cal.Rptr. 553, 458 P.2d 465 (Byers), vacated in California v. Byers (1971) 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9; People v. Superior Court (Kaufman) (1974) 12 Cal.3d 421, 428, 115 Cal.Rptr. 812, 525 P.2d 716 (Kaufman); Daly v. Superior Court (1977) 19 Cal.3d 132, 137 Cal.Rptr. 14, 560 P.2d 1193 (Daly).) These cases recognize with varying degrees of explicitness *377 that any judicial grant of immunity must be carefully crafted lest it impinge on the legislative power to define and prescribe punishments for crimes, and on the executive power to enforce the laws thus adopted.
Prior to Byers, supra, 71 Cal.2d 1039, 80 Cal.Rptr. 553, 458 P.2d 465, California cases viewed immunity as a creature solely of statute. (See Ex parte Tahbel (1920) 46 Cal.App. 755, 759, 189 P. 804; Ex parte Cohen (1894) 104 Cal. 524, 528, 38 P. 364; Ex parte Clarke (1894) 103 Cal. 352, 354, 355, 37 P. 230.) Byers marked a movement away from strict insistence on explicit statutory authorization. The court has continued, however, to ground any grant of immunity in at least implicit legislative approval. In Byers the court held that the disclosure of information under a statute requiring a driver to provide certain information when involved in an auto accident would violate the driver's privilege against self-incrimination unless he were immunized against the use of his disclosures in a criminal prosecution. (Byers, supra, 71 Cal.2d. at p. 1050, 80 Cal.Rptr. 553, 458 P.2d 465.) Because there was "no statute explicitly providing" such protection, the court had to determine "whether such restrictions may properly be imposed by this court." (Ibid.) As the court saw it, the case required resolution of "the conflict between the individual's right to protection under the Fifth Amendment privilege against self-incrimination and the government's substantial interest in having citizens report or otherwise divulge information to effectuate various regulatory measures designed to promote the public welfare." (Id. at p. 1049, 80 Cal.Rptr. 553, 458 P.2d 465.) The judicial imposition of use restrictions, the court opined, would "neither frustrate any apparent significant legislative purpose nor unduly hamper criminal prosecutions of drivers involved in accidents resulting in damage to the property of others."[9] (Id. at pp. 1053-1054, 80 Cal.Rptr. 553, 458 P.2d 465.) Moreover, the Legislature remained free to "overrid[e]" such a measure by "enacting legislation declaring that information derived from disclosures required by [Vehicle Code] section 20002, subdivision (a), may be used in criminal prosecutions, in which case the privilege *378 could be claimed in appropriate situations." (Id. at p. 1055, 80 Cal.Rptr. 553, 458 P.2d 465, italics in original.)
The decision was vacated by the United States Supreme Court, a plurality of which held that the disclosures at issue were not protected by the Fifth Amendment. (Byers, supra, 402 U.S. at p. 427, 91 S.Ct. 1535.) The case retains vitality, however, as precedent for the judicial imposition of immunity in this state based upon implied statutory authority. Thus in Kaufman, supra, 12 Cal.3d 421, 115 Cal.Rptr. 812, 525 P.2d 716, the court held that despite the absence of express legislative authorization, the superior court had the power to immunize disclosures by a defendant during pretrial discovery in a civil action by the public prosecutor for deceptive advertising (see Bus. & Prof.Code, §§ 17500 et seq.) and unfair competition (see former Civ.Code, § 3369; see now Bus. & Prof. Code, § 17204). The court described Byers, supra, as resting on a "statutory authorization for the grant of immunity" that was "implicit in the legislation which compelled disclosure, as such legislation would otherwise be rendered impotent." (Kaufman, supra, 12 Cal.3d at p. 428, 115 Cal.Rptr. 812, 525 P.2d 716.) The court went on to imply legislative authority in the matter before it from the statutes authorizing the maintenance of such suits by a public prosecutor, and from a provision of the discovery act authorizing the trial court to make "`any other order which justice requires to protect [a] party or [deposition] witness from annoyance, embarrassment, or oppression.'" (Id. at p. 425, 115 Cal.Rptr. 812, 525 P.2d 716, quoting former Code. Civ. Proc., § 2019, subd. (b)(1); see now Code Civ. Proc., § 2025.420, subd. (b).) The court reasoned that "a grant of immunity with a proper protective order would not frustrate but would further the legislative purpose of suppressing deceptive advertising" (Kaufman, supra, 12 Cal.3d at pp. 428-429, 115 Cal.Rptr. 812, 525 P.2d 716, fn. omitted), "[n]or would it unduly hamper the prosecution of persons who, in the judgment of the authorities, should be subjected to criminal proceedings" (id. at p. 429, 115 Cal.Rptr. 812, 525 P.2d 716), and the Legislature remained "free to redefine the limits of authorization" if it believed the court's allowance of immunity did not conform to legislative intent (ibid, fn. omitted).
The court undertook its most painstaking consideration of judicially declared immunity in Daly, supra, 19 Cal.3d 132, 137 Cal.Rptr. 14, 560 P.2d 1193, which was a civil action for damages by the survivors of a newspaper editor who had been killed by hired gunmen in the course of a labor dispute. When some of the defendants refused on self-incrimination grounds to answer deposition questions, the plaintiffs moved for a protective order granting use immunity for their testimony. (Ibid.) The trial court denied the motion, ordering instead that the defendants would be barred from testifying at trial if they did not waive their Fifth Amendment privilege for purposes of discovery. (Ibid.)
In reviewing this order, the Supreme Court acknowledged the federal rule we have emphasized, i.e., that "a witness who refuses to answer questions on the ground of the constitutional privilege against self-incrimination may nevertheless be compelled to answer if granted immunity against prosecutorial use ... in a subsequent criminal proceeding against the witness." (Daly, supra, 19 Cal.3d at pp. 142-143,137 Cal.Rptr. 14, 560 P.2d 1193, italics added.) Because immunity is "the quid pro quo constitutionally required as a condition to stripping the witness of the privilege," it typically serves the interests of the person seeking answers, not the person from whom they are sought. (Id. at p. *379 147, fn. 9, 137 Cal.Rptr. 14, 560 P.2d 1193) This was illustrated by Kaufman, where "[t]he protective order ... was not for the benefit of the witness, who would have preferred to stand on the privilege [citation], but was for the protection of the right of the party seeking the order (the People) to obtain discovery without being blocked by a claim of privilege...." (Daly, supra, at p. 147, fn. 9, 137 Cal.Rptr. 14, 560 P.2d 1193.)
Against this interest in disclosure had to be weighed a concern not acknowledged in Lybarger, i.e., that in the absence of at least implied legislative authority, immunity should not be granted where it would "unduly hamper prosecution" of the witness whose answers would be immunized. (Daly, supra, at p. 147, fn. 9, 137 Cal.Rptr. 14, 560 P.2d 1193.) The court first alluded to this interest in rejecting a suggestion of mootness, observing that the case was important partly because of "the impact of any immunity order upon the official duties of those charged with prosecuting crime." (Id. at p. 141, 137 Cal.Rptr. 14, 560 P.2d 1193, fn. omitted.) Concern with this potential impact pervades, indeed it dominates, the court's analysis. Thus the court wrote that "the power to grant [an] immunity order" can be derived from "statutory implication rather than express provision" (id. at p. 143, 137 Cal.Rptr. 14, 560 P.2d 1193) if, among other things, its exercise will "`neither frustrate any apparent significant legislative purpose nor unduly hamper criminal prosecutions ....'" (Id. at p. 144, 137 Cal.Rptr. 14, 560 P.2d 1193, quoting Byers, supra, 71 Cal.2d at p. 1054, 80 Cal.Rptr. 553, 458 P.2d 465; italics in original.) In contrast to the hit-and-run statute at issue in Byers, the civil discovery statutes disclosed no "legislative preference for imposing the burdens of use immunity upon prosecuting authorities" in order to serve the interests furthered by disclosure, which here were purely private. (Ibid.) The private nature of these interests also distinguished the case from Kaufman, supra, 12 Cal.3d at pp. 428-429, 115 Cal.Rptr. 812, 525 P.2d 716, where the immunity was sought by prosecuting authorities, who would themselves conduct the questioning and thus "retain[] complete control over the scope of immunity through the power to determine what questions would be put...." (Daly, supra, at p. 144, 137 Cal.Rptr. 14, 560 P.2d 1193.)
At the same time, the court was unwilling to hold that the discovery interests of private litigants should be wholly disregarded. Thus it rejected the suggestion of prosecutors that immunity should only be available when actively requested by prosecuting authorities. (Daly, supra, 19 Cal.3d at p. 146, 137 Cal.Rptr. 14, 560 P.2d 1193.) The court acknowledged that this was the case in criminal prosecutions by virtue of a statute directly governing the issue. (Ibid.; see Pen.Code, § 1324.) It did not follow, however, that prosecutorial instigation was "a universal prerequisite to a judicial grant of immunity." (Id. at p. 146, 137 Cal.Rptr. 14, 560 P.2d 1193, citing People v. Coleman, supra, 13 Cal.3d 867, 120 Cal.Rptr. 384, 533 P.2d 1024, Tarantino v. Superior Court (1975) 48 Cal.App.3d 465, 122 Cal.Rptr. 61 (Tarantino), and Byers, supra, 71 Cal.2d 1039, 1048-1057, 80 Cal.Rptr. 553, 458 P.2d 465.)[10] The *380 interests of prosecutors required protection, as reflected in the "general condition stated in Kaufman and Byers that the granting of immunity not `unduly hamper' subsequent criminal prosecutions." (Id. at p. 147, 137 Cal.Rptr. 14, 560 P.2d 1193.) Provided this condition is satisfied, however, and given the Legislature's promotion of discovery as a means of enhancing the truthseeking function in civil cases, "a civil litigant is entitled to the inclusion in a protective order under Code of Civil Procedure section 2019, subdivision (b)(1), of whatever use and derivative use immunity is required to eliminate unnecessary barriers to effectuation of the litigant's discovery rights." (Id. at p. 147, 137 Cal.Rptr. 14, 560 P.2d 1193, fn. omitted.)
The court concluded that a private litigant could obtain a protective order immunizing a witness in the course of discovery provided that no objection was lodged by prosecutors after timely and adequate notice of the request to the local district attorney, the state Attorney General, and United States Attorney. (Daly, supra, 19 Cal.3d at pp. 148-149, 137 Cal.Rptr. 14, 560 P.2d 1193.) A prosecutor could veto the proposed immunity by submitting a sworn statement asserting potential interference. (Ibid.) Such a statement would be viewed as "conclusively establishing that an immunity order as described in the notice cannot be issued because it would or might unduly hamper criminal prosecution of the witness." (Id. at p. 148, 137 Cal. Rptr. 14, 560 P.2d 1193.) The only recourse for the party seeking immunity would be "to attempt to persuade the prosecutor to withdraw the objection." (Id. at p. 149, 137 Cal.Rptr. 14, 560 P.2d 1193.)
The Daly decision reflects a meticulous balancing of the needs of would-be interrogators against the prerogative of the Legislature to define crimes and their punishments, and the power and duty of the executive to prosecute the offenses thus defined. An integral part of this balancing was judicial supervision of the process. The immunity authorized by that decision thus entails, first, legislative authority implied from statutes applicable to the controversy in which the request for immunity arose; second, due consideration of the risk that immunity may significantly hinder enforcement of the criminal laws; and third, direct involvement of a court by whom the merits of a particular request *381 may be considered, and conflicting interests weighed.
This approach could hardly contrast more sharply with the "Lybarger immunity" recognized in Gwillim. If applied universally, Lybarger/Gwillim immunity would empower any supervisor of public employees to immunize their answers merely by threatening discipline for failure to answer. Such a regime shares none of Daly's careful balancing. It is entirely unmoored from any statute, and requires no judicial oversight of any kind. It takes no account of the paramount concern expressed in Daly "that the granting of immunity not `unduly hamper' subsequent criminal prosecutions." (Daly, supra, 19 Cal.3d at p. 147,137 Cal.Rptr. 14, 560 P.2d 1193, citing Kaufman, supra, 12 Cal.3d at p. 429, 115 Cal.Rptr. 812, 525 P.2d 716 & Byers v. Justice Court, supra, 71 Cal.2d at p. 1054, 80 Cal.Rptr. 553, 458 P.2d 465.)
The power to immunize disclosures cannot be freely dispensed without "`risk[ing] the serious possibility of corruption, abuse, and substantial mischief and uncertainty in the prosecution of criminal cases....'" (Butler v. State (1983) 462 A.2d 1230, 1233-1234, 55 Md.App. 409, quoting Winkles v. State (1978) 392 A.2d 1173, 1175-1176, 40 Md.App. 616; see S. Clymer, Compelled Statements from Police Officers and Garrity Immunity (2001) 76 N.Y.U. L.Rev. 1309, 1333-1334 (Compelled Statements) [noting dangers of taint by dissemination to other witnesses during internal police department investigations].) Indeed, the power to "`immunize'" coworkers' statements may be used by unscrupulous investigators to shield friends and colleagues from criminal sanctions. (See Compelled Statements, supra, 76 N.Y.U. L.Rev. at pp. 1334-1335, fn. omitted ["If inclined to jeopardize a prosecution, an unscrupulous internal affairs investigator can compel a statement when not required to do so in order to `immunize' the target officer. Similarly, such an investigator can expose potential prosecution witnesses to compelled statements in order to taint and possibly disqualify them from testifying."]; ibid., fn. 95 [citing practices in Los Angeles Police Department investigations including "group interviews during which officers involved can `get their stories straight'"].)
Even without corrupt motives, immunity can impede or obstruct vindication of the criminal laws. The risk is apparent from Gwillim itself, where the trial court dismissed the criminal prosecution after prosecutors and then the complaining witness were exposed to the defendant officer's immunized statements. (Gwillim, supra, 223 Cal.App.3d at p. 1260, 274 Cal.Rptr. 415.) This court held that dismissal was unwarranted "at this stage." (Id. at p. 1258, 274 Cal.Rptr. 415.) We did so, however, in deference to the trial court's findings of fact adverse to the defendant's most promising theory, which was that his immunized statements had been used to motivate the complaining officer to press charges and testify against him. (Id. at pp. 1274-1275, 274 Cal.Rptr. 415.)
Prosecutors faced with a claim of immunity "taint" have not always fared so well. (See United States v. Hubbell (2000) 530 U.S. 27, 120 S.Ct. 2037, 147 L.Ed.2d 24; U.S. v. North (D.C.Cir.1990) 910 F.2d 843, 856, 871, modified on another point in U.S. v. North (D.C.Cir.1990) 920 F.2d 940, cert, denied; U.S. v. Poindexter (D.C.Cir.1991) 951 F.2d 369, 377.) As these cases and Gwillim illustrate, vindication of the criminal laws can be hindered, and in extreme cases thwarted altogether, not only by the prosecutor's own exposure to immunized disclosures and evidence arguably derived from them, but by the exposure of other witnesses to tainted evidence during the *382 course of the investigation or proceeding.[11] It requires little imagination to discern a substantial risk that supervisors clothed with the power to peremptorily immunize the disclosures of their subordinates could quickly entangle a potential criminal prosecution in such Gordian complexities that no prosecutor could carry the "heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources." (Kastigar, supra, 406 U.S. at pp. 461-462, 92 S.Ct. 1653, fn. omitted.)
The court explicitly acknowledged such dangers in Daly, supra, 19 Cal.3d 132, 137 Cal.Rptr. 14, 560 P.2d 1193, in response to the plaintiffs' attempt to minimize the "impairment of prosecutorial functions" by emphasizing that any immunity granted would only bar use, not prosecution. The court wrote that "the very existence of such testimony" could present prosecutors with "serious problems of proving its complete independence from evidence introduced in the criminal proceeding." (Id. at p. 145, 137 Cal.Rptr. 14, 560 P.2d 1193, italics in original.) Nor could a court eliminate these problems, as the plaintiffs suggested, by "`an adequately drawn protective order that seals the disclosed information from disclosure beyond the confines of the civil litigation or [by] other similar restrictions on the dissemination of the compelled testimony.'" (Ibid.) Even if the deposition testimony itself were not disseminated, the plaintiffs could use it to develop other evidence; moreover, they could introduce the testimony, or evidence derived from it, at trial, thereby thrusting upon any future prosecutor the burden of proving that evidence offered at the criminal trial "had origins wholly independent of evidence developed by petitioners after taking [a defendant's] deposition under an immunity order." (Ibid.)
Of course, even in the absence of immunity, a witness's exposure to a defendant's compelled statements can impede or prevent prosecution through the operation of the exclusionary rule. But assuming this rule places the same burden on prosecutors that immunity would impose, it still does not reflect the same balancing of interests. It is a remedial device intended to restore an individual whose rights have been violated to a position approximating the one he would occupy had no violation occurred. An inescapable effect of the rule is to give one official (a defendant's supervisor) the practical ability to impede the activities of another official (the public prosecutor), in much the same way that a police officer can interfere with prosecution by conducting an unlawful search or detention. To convert the exclusionary rule into a form of immunity would transform this practical ability into a lawful power. In the past, such powers have been granted either by explicit legislative *383 directive or by a judicial balancing of legislative objectives and prosecutorial interests. Before courts should grant such powers, particularly of the breathtaking scope contemplated here, the propriety of doing so should be carefully examined in light of the competing considerations and interests.
Requiring a clear grant of immunity provides superior protection to prosecutorial interests precisely because it disables other officials from unilaterally compelling statements that may taint later prosecutions. If an official wants to compel incriminating disclosures, he will have to secure immunity; if he fails to do so, the employee is entitled to stand on his right of silence without fear of repercussions. If the employee does this, no tainted disclosures will be made, and no prosecutor will be required to overcome a later claim that his case has been poisoned. To be sure, the employee's assertion of this right may pose impediments to disciplinary investigations, but surely it is not for the courts to solve that problem with a blanket regime of automatic immunity.[12] In addition, "The process of formal grants of immunity ... provides time for the prosecutor to protect the testimony of potential witnesses by obtaining canned statements and by shielding these witnesses from exposure to the immunized testimony." (U.S. v. Koon (9th Cir.1994) 34 F.3d 1416, 1433, fn. 13, rev'd on other grounds, Koon v. United States (1996) 518 U.S. 81, 116 S.Ct. 2035,135 L.Ed.2d 392.)
Moreover, reliance on the exclusionary rule, or on a supposed automatic immunity of ill-defined dimensions, will often fail to provide the interrogatee with adequate assurance of protection against penal consequences if he complies with demands that he answer incriminating questions. The interrogator may tell him so, as plaintiffs supervisor Guzman did here, but it is not the interrogator's opinion that mattersit is the opinion of the prosecutor, and ultimately a judge, in some future trial. The interrogatee cannot be certain that the prosecutor will not successfully assert some unguessed-at weakness in the apparent compulsion, e.g., the employer lacked authority to back up the threat of dismissal. (See United States v. Indorato (1st Cir.1980) 628 F.2d 711, 716 [exclusionary rule triggered only by explicit threat of discharge and state statute or ordinance mandating discharge]; State v. Wolery, supra, 348 N.E.2d 351, 355 [46 Ohio St.2d 316] [noting open question whether witnesses were effectively shielded where they testified under prosecutor's statutorily unauthorized promise of immunity and deliberate failure to give Miranda warnings]; State v. Johnson (1969) 462 P.2d 933, 941 [77 Wash.2d 423] [because defendant and not witness challenged prosecutor's unauthorized promise of immunity, case did not squarely present questions whether promise was valid or "whether there exist[ed] an equitable right to [its] enforcement"]; State ex rel. Munn v. McKelvey (Mo.1987) 733 S.W.2d 765, 768-769 [citing cases holding that in absence of statutory authorization, "promises of immunity" by sheriffs and prosecutors "are not binding and constitute no bar to a *384 subsequent prosecution of the immunized witness"]; id. at p. 769, citation omitted [stating general rule in other jurisdictions "that a prosecutor is not empowered, solely by virtue of his office, to confer immunity upon a witness"]; id. at p. 770 [prohibition issued to prevent efforts to compel answers where neither unauthorized promise of immunity nor doctrine of "equitable immunity" was sufficient to override privilege]; cf. U.S. v. Friedrick (D.C.Cir.1988) 842 F.2d 382, 395 [trial court properly excluded statements made after series of ambiguous exchanges].)
The federal high court has repeatedly acknowledged these hazards. (See Chavez v. Martinez, supra, 538 U.S. at pp. 771-772, 123 S.Ct. 1994 ["insistence on a prior grant of immunity is essential to memorialize the fact that the testimony had indeed been compelled and therefore protected from use against the speaker in any `criminal case'"]; Pillsbury Co. v. Conboy, supra, 459 U.S. 248, 261-262, 103 S.Ct. 608 [rejecting, as basis for compelled answers, the trial court's "predictive judgment" that "a court in any future criminal prosecution ... will be obligated to protect against evidentiary use of the deposition testimony petitioners seek"].)
Because no immunity was granted or offered here, plaintiff could not be compelled to answer potentially incriminating questions, and his refusal to do so could not form the basis for discipline. The finding of insubordination therefore cannot be sustained.

III. Unbecoming Conduct

A. Misleading Statements

Plaintiff contends that there is "no evidence" that he "misled the court when he argued the legal concept of unavailability" for purposes of admitting the hearsay statements of the witness Boyd. This assertion misstates the charge, which is not that he misled the court but that he tried to do so. It also supposes, contrary to fact, that he merely "argued the legal concept of unavailability." Instead he asserted as a fact that he had "not sent [his] investigator out to try to find" the witness "in large part" because "Mr. Boyd has a warrant out for his arrest," and if the police had failed to serve that warrant, "I think that my investigator is going to be very hard put to find an individual who is avoiding contact with anybody that has to do with the judicial system." Later in the hearing plaintiff said he wanted to tell the jury that the reason Boyd had not been called to testify was "because he's got a warrant for his arrest and he's ducking." These are not abstract legal arguments but false statements of fact. As plaintiff knew perfectly well, on the day before he made these statements Boyd was not "ducking" process but was sitting in front of a television in the first place anyone would look for him: his home. Had plaintiff sent an investigator or process server there, he would likely have found Boyd, as plaintiff himself did. Further, the evidence amply supported an inference that as of the time he spoke, the reason plaintiff had made no attempt to serve Boyd was not that he thought it would be futile, as he claimed, but quite the reverse; he feared it would be successful, which would preclude the introduction of Boyd's hearsay statements, on whose ambiguity and incompleteness plaintiff hoped to rely. The evidence amply supports a finding that plaintiff willfully sought to deceive the court.
Plaintiff contends that he properly "argued a good faith belief that the witness was not going to be amenable to service of process," based on evidence that "the witness had avoided the Public Defender's investigator, David Jaquez, for most of the time the case was pending"; that the witness *385 had attempted to evade the police on the occasion when he and plaintiffs client were arrested; and that the reason for that attempt, as he reportedly stated to officers, was a belief that "`he had a warrant'" outstanding against him. Plaintiff argues from these facts that "it was reasonable for [him] to believe that witness Boyd was avoiding service, despite [Boyd's] protestations to the contrary at their chance meeting." Had plaintiff disclosed the "chance meeting" he would certainly have been free to put forth the highly implausible hypothesis that Boyd was nonetheless avoiding service. What he could not do was assert as a fact that Boyd was avoiding service, or that he believed Boyd was avoiding service, when he knew that Boyd had been sitting unconcernedly in his house the day before.
Plaintiff attempts to compare the case to Shaeffer v. State Bar (1945) 26 Cal.2d 739, 160 P.2d 825 (Shaeffer), where an attorney was charged with misleading a court by failing to cite the most relevant case pertaining to a point then being argued. In holding that the incident did not warrant discipline, the Supreme Court observed that the appellant had "apparently left to opposing counsel, who was present, the burden of presenting the other side of the argument," and it did not appear that he "intentionally attempted to mislead the court." (Id. at p. 748, 160 P.2d 825.) But that case involved the omission of information of a type that the attorney's adversary might reasonably be expected to find and present. Here plaintiff could hardly "le[ave] to opposing counsel" the disclosure of facts known only to plaintiff. Far nearer the mark than Shaeffer is Di Sabatino v. State Bar (1980) 27 Cal.3d 159, 163, 162 Cal.Rptr. 458, 606 P.2d 765, where an attorney was disciplined for failing to inform a commissioner, to whom he had applied for a reduction in bail on behalf of this clients, that he had already twice applied unsuccessfully for such relief. The attorney contended, among other things, that he was entitled to assume that the commissioner would know or infer that a reduction had already been denied. "The short answer to this argument," the Supreme Court replied, "is one stated by Justice Brandeis: `A judge is presumed to know the elements of law, but there is no presumption that he knows the facts.'" (Id. at p. 162, fn. 2, 162 Cal.Rptr. 458, 606 P.2d 765, quoting Jackson, The Wisdom of the Supreme Court (1962) p. 227.)
Nor was plaintiff guilty of a mere material omission. (But see Di Sabatino, supra, 27 Cal.3d at pp. 162-163, 162 Cal. Rptr. 458, 606 P.2d 765, citations omitted ["It is settled that concealment of material facts is just as misleading as explicit false statements, and accordingly, is misconduct calling for discipline"].) He affirmatively represented that he considered it futile to attempt to find and serve the witness, when, as the court below was entitled to find, he knew it was not. To make Shaeffer analogous, the attorney there would have had to not only remain silent as to the case he failed to cite, but affirmatively represent to the court that he had not looked for such a case because he believed it did not exist. If the attorney had made such a statement with knowledge that the case did exist, his conduct could have been described in one word: "lying."
Plaintiff makes the remarkable claim that his encounter with Boyd "only established the witnesses] presence in the state" and "did not ... materially bear on whether the witness was amenable to service." On the contrary, to say that one is "amenable to service" means only that he can be found and effectively served with process. The witness's posited reluctance to comply with process once served has no bearing on his amenability to service before service is attempted. Obviously, *386 knowing where he is will tend to make him amenable to process provided he is located within the territorial jurisdiction of the court and has not secreted himself. Here there is no suggestion that the witness Boyd would have resisted an attempt to approach and hand him a subpoena. That is all "amenability to process" entails.
Plaintiff has at times made much of the apparent opinion of Judge Teilh that plaintiff did not materially mislead him. We fail to discern the relevance of this opinion. The governing question is the nature of plaintiffs conduct, not its effect on its intended hearer, or even the hearer's opinion of its gravity.

B. Work Product Privilege

Plaintiff contends that his conversations with and knowledge about the witness Boyd were subject to the work product privilege, and could not properly be relied upon for an inference that plaintiff acted with "deceitful intent."
"`At its core, the work product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case.'" (Hobbs v. Municipal Court (1991) 233 Cal.App.3d 670, 692, 284 Cal.Rptr. 655, disapproved on another point in People v. Tillis (1998) 18 Cal.4th 284, 295, 75 Cal.Rptr.2d 447, 956 P.2d 409; quoting United States v. Nobles (1975) 422 U.S. 225, 238, 95 S.Ct. 2160, 45 L.Ed.2d 141.) Where an attorney's own thoughts, impressions, research, or theories are set down in a writing, the writing is "`core' work product" and its discovery is absolutely barred. (2,022 Ranch, L.L.C. v. Superior Court (2003) 113 Cal.App.4th 1377, 1390, 7 Cal.Rptr.3d 197, quoting Izazaga v. Superior Court (1991) 54 Cal.3d 356, 382 & fn. 19, 285 Cal.Rptr. 231, 815 P.2d 304; see citing former Code Civ. Proc, § 2018, subd. (c); see now Code Civ. Proc., § 2018.030, subd. (a).) Other materials prepared by or on behalf of an attorney in representing a client are "`general' work product" and subject only to conditional protection. (2,022 Ranch, supra, at p. 1390, 7 Cal.Rptr.3d 197; see former Code Civ. Proc., § 2018, subd. (b); see now Code Civ. Proc., § 2018.030, subd. (b).)
Here plaintiff has pointed to nothing that falls within either category. He seems to suggest that Boyd's statements to him, as reported by Boyd, were privileged.[13] This suggestion cannot be sustained. *387 Whatever else the work product doctrine may do, it does not stop the mouth of an independent, percipient witness with respect to what he told an attorney.
Plaintiff may mean to focus on his statements to Boyd. At least he asserts that these statements, as well Boyd's to him, "are the very substance of the attorney's thoughts and impressions of the witness, and privileged under the constitutionally mandated work product privilege of a criminal defense attorney." But we doubt very seriously that an attorney's statements to an independent witness can be claimed as work product. Under familiar principles of waiver, a privilege is lost when privileged matter is willingly disclosed to persons outside the scope of the privilege. If an attorney wants to protect his thoughts and impressions from disclosure, he can begin by keeping them to himself when he speaks to persons outside the defense team.
In any event, plaintiffs argument is fragmentary to the point of incoherence. He criticizes the trial court's reliance on civil cases, and claims that criminal defense attorneys possess a "constitutionally mandated work product privilege...." But in the only germane precedent he cites, the Supreme Court pointedly declared that "the work product doctrine is not constitutionally founded...." (Izazaga v. Superior Court, supra, 54 Cal.3d at p. 381, 285 Cal.Rptr. 231, 815 P.2d 304, italics added.) He cites Penal Code section 1054.3, which describes the scope of discovery to which the prosecution is entitled in a criminal matter; but that statute has no apparent tendency to create, define, or otherwise affect any' claim of "work product" by a criminal defense attorney whose own conduct is under scrutiny in a disciplinary investigation by his employer.
The one source plaintiff cites that actually bears on a criminal defense attorney's "work product" is Penal Code section 1054.6, which protects from disclosure "materials or information which are work product as defined in subdivision (a) of Section 2018.030 of the Code of Civil Procedure ..." The cross-referenced statute refers exclusively to core work product, declaring, "A writing that reflects an attorney's impressions, conclusions, opinions, or legal research or theories is not discoverable under any circumstances." (Code Civ. Proc, § 2018.030, subd. (a), italics added.) The succeeding subdivision provides conditional protection for "[t]he work product of an attorney, other than a writing described in subdivision (a)...." (Code Civ. Proc, § 2018.030, subd. (b).) If the evidence cited by plaintiff is "work product" at all, it is work product "other than a writing described in subdivision (a)...." As such it falls outside the protection of the criminal work product shield set forth in Penal Code section 1054.6. (See Izazaga v. Superior Court, supra, 54 Cal.3d at p. 382, fn. 19, 285 Cal.Rptr. 231, 815 P.2d 304, ["[S]ection 1054.6 expressly limits the definition of `work product' in criminal cases to `core' work product; that is, any writing reflecting `an attorney's impressions, conclusions, opinions, or legal research or theories.' Thus, the qualified protection of certain materials under Code of Civil Procedure section 2018, subdivision (b) [now § 2018.030, subd. (b)], applicable in civil cases, is no longer available in criminal cases"].)
Plaintiff contendswithout benefit of supporting authoritythat criminal defense attorneys are constitutionally entitled *388 to "`seek to mislead or deceive'" by "fail[ing] to disclose material evidence...." It is undoubtedly true that, without more, defense counsel is generally under no obligation to disclose information adverse to his client. That does not entitle counsel to seek to affirmatively mislead the court about facts bearing on such threshold determinations as the availability of a witness to testify at trial. Here counsel asserted that it would be futile to look for a witness whom he knew had been sitting at home a day earlier watching football. He also asserted that the witness was seeking to evade service of an outstanding warrant when the witness had apparently told him he was unconcerned about the warrant and would testify truthfully if summoned to do so. This was not a mere failure to reveal information damaging to plaintiffs client, but an unmistakable attempt to affirmatively mislead the court. No privilege protects such an attempt from disciplinary scrutiny.
The trial court was quite right to conclude that plaintiffs "work product" claim is "legally unsupported."
Substantial evidence supports the finding that plaintiff engaged in conduct unbecoming a county employee and tending to bring discredit upon his office.

IV. Biased or Conflicted Decisionmaker

Plaintiff contends that the trial court erroneously rejected his arguments to the effect that he was denied an impartial decisionmaker. He asserts that his rights were infringed by preexisting relationships involving three attorneys who participated in the disciplinary proceedings against him. First he complains that assistant county counsel Susan Levenberg, who presided over his Skelly hearing, "was also the attorney for the Santa Clara County Personnel Board." Defendant points out that after speaking to Levenberg about the matter, plaintiffs attorney expressly acceded in writing to her presiding over the hearing. Levenberg, who was retired by the time of the proceedings below, declared that during this (telephone conversation she "disclosed to Spielbauer's attorney that I represented the Personnel Board in other matters," told him "that there is an ethical wall between myself and the labor attorneys" in the office, and said that she had not spoken to anyone in the office about the matter. As a result, defendant contends, plaintiff waived any objection to Levenberg's participation. Plaintiff addresses this argument only through the oblique assertion that Levenberg did not tell his attorney "that she was also the attorney for the Santa Clara County Personnel Board." The cited portions of the record are sufficient to establish that Levenberg provided some legal services to the Personnel Board, and one of them asserts that at some unspecified time she "was the primary attorney for the Personnel Board." None of them supports the critical assertion that Levenberg failed to disclose this fact to plaintiffs attorney. If there is any evidence to that effect, plaintiff has neglected to bring it to our attention. Even if he had, it would presumably raise only an issue of, fact, the trial court's resolution of which is supported by Levenberg's sworn statement. Plaintiff has therefore failed to establish any error with respect to Levenberg's role as Skelly officer.
Plaintiff also complains that the board lacked impartiality because "the counsel for the Personnel Board[,] Debra Cauble[,] and the prosecuting attorney for the Public Defender, Nancy Clark[,] had a relationship of attorney and client." in that "Ms. Clark was the labor an[d] employment specialist relied upon by Ms. Cauble in making decisions as a supervising County *389 Counsel." Again plaintiff predicates a demand for reversal on a sketchy argument without even summarizing the relevant evidence, perhaps in the expectation that we will pore over the record to adorn his naked factual claims with evidentiary raiment. We are a court of review, not a clothier.
In any `event, we see no colorable merit in the claim. It appears to rest on the factual premise that Cauble "utilized Nancy Clark as here [sic] labor and employment attorney in handling administrative matters" and that Clark "was the labor an[d] employment specialist relied upon by Ms. Cauble in making decisions as a supervising County Counsel." The only cited record support is Cauble's deposition, in which she testified that she did not recall ever consulting Clark, but that Clark was one of two labor specialists in the office and that Cauble "probably did consult one or both of them" with respect to internal management issues. When it was suggested to plaintiffs counsel that he "break" his inquiry "down" to ascertain which labor specialist Cauble consulted, counsel declined, stating, "I think it would be better if I didn't break it down, frankly. My point being that I just want to know if you consulted with those people in general for those purposes...." Counsel verges on misrepresenting the record when he cites this testimony for the proposition that Cauble in fact consulted Clark on management issues.
Furthermore, plaintiff fails to establish his legal premise, which is that a decisionmaker cannot be impartial if he has ever sought legal advice from one of the attorneys now before him. Plaintiff may have presented an argument to this effect below, but has presented none on appeal, and we again decline to search the record to flesh out his appellate presentation. The only case he cites on any specific point in this portion of his brief is Brand v. 20th Century Ins. Co. (2004) 124 Cal. App.4th 594, 21 Cal.Rptr.3d 380, which held that an insurance company was entitled to exclude the testimony of its own former attorney when the latter sought to testify as an expert on claims practices. The crucial issue was whether a "substantial relationship" existed between the attorney's prior representation and the current litigation, a suit against the company. (See id. at pp. 602, 21 Cal.Rptr.3d 380 et seq.; Rules Prof. Conduct, rule 3-310(E).) The reviewing court held that it did. (Id. at p. 607, 21 Cal.Rptr.3d 380.) Plaintiff cites the case for the propositions that "the existence of attorney/client relationship [sic] presumes the exchange of client confidence and the mere passage of time does not extinguish the materiality of that relationship." This is doubtless true with respect to rules of professional conduct governing conflicts of interest and an attorney's duty of loyalty to his clients, past and present. But we are concerned here with the ability of the putative former client to preside impartially over a case in which a former attorney represents a party. The cited case has no discernible bearing on that issue.
Plaintiff also cites Code of Civil Procedure section 170.1, subdivision (a)(2), which states in relevant part that a judge shall be disqualified if the judge served as a lawyer in the pending proceeding or a related proceeding. Plaintiff specifically refers to subdivision (a)(2)(B) of that statute, which declares that a judge shall be deemed to have served as a lawyer in the present proceeding if, within the preceding two years, he was party to certain relationships "in the private practice of law." Even if we were inclined to extend this provision beyond its terms to the practice of law in the public sector, it hardly supports plaintiffs apparent premise, which is that the passage of time has no tendency *390 to vitiate the effect of past relationships on a judge's ability to be impartial. The statute seems to assume that two years may be enough time to dissipate whatever bias the past relationship might have engendered. Here of course there is no suggestion that Cauble was ever involved in the present matter or any related matter, nor that she has ever had the requisite type of relationship to anybody who might have been so involved, let alone that all these conditions existed within the two years preceding her actions here.

V. Conclusion

The foregoing analysis leaves only the question of disposition. According to county personnel rules, "The decision to suspend, demote or dismiss depends on the seriousness of the offense." (County Code, § A25-302, subd. (b).) Here the Board found plaintiff guilty of two offenses, one of whichinsubordinationwe have held legally insupportable. The Board's findings explicitly based plaintiffs dismissal in part upon this offense, explaining, "As a public employee, [plaintiff] was properly informed of his rights and thereby required to respond to questions posed to him by his supervisor.... [Plaintiffs] refusal to acknowledge that his actions were improper and in violation of County rules indicates that [plaintiff] may engage in this type of behavior in the future. For these reasons, termination is the appropriate penalty." The record provides no basis to conclude that the Board would necessarily have sustained plaintiffs dismissal based upon the other offense alone. It is therefore necessary for the Board to make that determination.

DISPOSITION
The judgment is reversed with directions to issue a writ of mandamus directing the Personnel Board to vacate its decision and reconsider the same in light of the views here expressed.
PREMO and ELLA, JJ., concur.
NOTES
[1] Some months later, Judge Teilh expressed regret that these events had produced disciplinary action against plaintiff, stating that he did not believe any misconduct had occurred. Plaintiff has made much of this opinion at times, even suggesting that it precluded a finding of misconduct. He predicates no legal argument on it before us.
[2] The scope of the required protection was in some doubt until the Supreme Court ruled in Kastigar, supra, 406 U.S. at p. 453, 92 S.Ct. 1653, that the government could overcome the Fifth Amendment privilege by an undertaking to refrain from the direct use of the compelled disclosures (i.e., their admission into evidence), as well as derivative use (i.e., as means to the discovery or production of other incriminating evidence), in any criminal prosecution. Prior to that decision it had been widely supposed that defeasance of the privilege required a grant of transactional immunity, which exempts the interrogatee from prosecution with respect to matters disclosed under immunity. (Id. at pp. 449-453, 92 S.Ct. 1653; see Counselman v. Hitchcock (1892) 142 U.S. 547, 585-586, 12 S.Ct. 195, 35 L.Ed. 1110.) The widespread belief that transactional immunity was necessary spawned many statutes providing such immunity, including some two dozen still on the books in California.
[3] He can also be compelled to answer if some other rule of law precludes conviction: "`If, at the time of the transactions respecting which his testimony is sought, the acts themselves did not constitute an offense, or, if, at the time of giving the testimony, the acts are no longer punishable; if the statute creating the offense has been repealed; if the witness has been tried for the offense and acquitted, or, if convicted, has satisfied the sentence of the law; if the offense is barred by the statute of limitations, and there is no pending prosecution against the witness, he cannot claim any privilege under the provision of the constitution, since his testimony could not be used against him in any criminal case against himself, and consequently he is not compelled to be a witness "against himself."'" (Blackburn v. Superior Court (1993) 21 Cal.App.4th 414, 428, 27 Cal.Rptr.2d 204, italics removed, quoting Ex Parte Cohen (1894) 104 Cal. 524, 528, 38 P. 364.)
[4] Exercise of the privilege can also, in a noncriminal setting, furnish the basis for evidentiary inferences adverse to the interrogatee. (See Baxter v. Palmigiano (1976) 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810, quoting 8 Wigmore, Evidence (McNaughton rev. 1961) § 2272, p. 439.) Presumably, a public employee's silence, with or without immunity, could support inferences adverse to him with respect to matters under inquiry. Defendant here did not purport to rely on plaintiff's silence only for such evidentiary purposes. Rather it treated his refusal to answer as a distinct disciplinary offense.
[5] Defendant also quotes Hingsbergen v. State Personnel Board (1966) 240 Cal.App.2d 914, 921-922, 50 Cal.Rptr. 59, where the court wrote, "`A public employee, of course, cannot be forced to give an answer which may tend to incriminate him, but he may be required to choose between disclosing information and losing his employment.'" (See id. at p. 921, 50 Cal.Rptr. 59 [personnel board correctly stated that "`whatever appellant's rights may be as a private citizen, he must, as a state employee, obey orders to cooperate in an investigation of a state agency or be subject to disciplinary action'"].) That case was decided before most of the federal authorities on which we have relied, and the quoted statements are flatly incompatible with them.
[6] In addition to Kelly, supra, 94 Cal.App.3d 905, 156 Cal.Rptr. 795, and Szmaciarz, supra, 79 Cal.App.3d 904, 145 Cal.Rptr. 396, this supposition is reflected in a number of Court of Appeal decisions. In TRW, Inc. v. Superior Court (1994) 25 Cal.App.4th 1834, 1852-1854, 31 Cal.Rptr.2d 460(TRW), a defense contractor instructed an employee to attend a meeting with security officers to discuss alleged violations of company rules. The employee refused to attend the meeting without an attorney. After he was discharged for insubordination he brought a tort action against the employer. The trial court ruled in limine that in seeking to interrogate the employee, the contractor had been a government actor; that demanding his attendance without an attorney violated his constitutional rights; that the investigation had focused on the employee as a criminal suspect; and that the proposed interrogation was custodial. The Court of Appeal rejected the first, second, and fourth of these conclusions, without reaching the third. (Id. at pp. 1847, 1849, 1852, 31 Cal. Rptr.2d 460.) It then went on to declare in dicta that even if the contractor had been a public employer, it would have been entitled to dismiss an employee who refused to answer incriminating questions. (Id. at pp. 1852-1854, 31 Cal.Rptr.2d 460.) This view rested in part on the dictum in Lybarger, in part on selective reading of federal authorities, and in part on the apparent supposition that the rule of Turley, supra, applies only when an express waiver of immunity is demanded. Needless to say, we consider this an inaccurate statement of the governing law.

In People v. Humiston (1993) 20 Cal. App.4th 460, 473, 24 Cal.Rptr.2d 515, the court explicitly conflated interrogational immunity with the exclusionary rule, declaring, "Use immunity is a judicially declared rule of evidence based on the privilege against self-incrimination." (Italics added.) The court cited People v. Coleman (1975) 13 Cal.3d 867, 120 Cal.Rptr. 384, 533 P.2d 1024 (Coleman), as well as Ramona R. v. Superior Court (1985) 37 Cal.3d 802, 806-807, 210 Cal.Rptr. 204, 693 P.2d 789 (Ramona R.). In Coleman, the court held that when the prosecution elects to conduct a probation revocation hearing prior to a trial for substantive offenses arising from the same events, the defendant's testimony at the revocation hearing is inadmissible at trial. The genesis of this rule was the unfairness of permitting the prosecutor to use his power over the timing of these events to effectively shut the defendant's mouth at the revocation hearing. Although the court used the term "immunity" in discussing other cases, it properly described the mechanism it adopted as "a judicial rule of evidence" (Coleman, supra, 13 Cal.3d at p. 889, 120 Cal.Rptr. 384, 533 P.2d 1024) and an "exclusionary rule" (id. at pp. 889, 891, 892, 120 Cal.Rptr. 384, 533 P.2d 1024 et seq.). In Ramona R., a minor argued that the juvenile court presiding over a fitness hearing "erred in refusing to grant her immunity from use at trial of any statements she made in the fitness hearing or to her probation officer." (Ramona R., supra, 37 Cal.3d at p. 804, 210 Cal.Rptr. 204, 693 P.2d 789.) The court discussed earlier decisions in which it had adopted exclusionary rules, which it pervasively labeled "immunities," to shield statements by minors in juvenile court proceedings. (Id. at pp. 806, 210 Cal.Rptr. 204, 693 P.2d 789 et seq., citing Bryan v. Superior Court (1972) 7 Cal.3d 575, 587, 102 Cal.Rptr. 831, 498 P.2d 1079 & In re Wayne H. (1979) 24 Cal.3d 595, 599-600, 156 Cal.Rptr. 344, 596 P.2d 1.)
[7] The Legislature has already authorized a "grant[]" of immunity to witnesses in state civil service matters. (Gov.Code, §§ 18676, 18677.) Although the statutes do not explicitly identify the persons empowered to make such a "grant," they probably do not contemplate an immunity arising automatically upon the mere asking of questions by a supervisor. In any event, although we have found some two dozen statutes expressly providing for immunity in various situations, none applies to disciplinary investigations involving local public employees. Nor are we aware of any local enactment purporting to grant, or authorize the granting of, such immunity. The apparent absence of any such local enactment makes it unnecessary to consider whether local legislators have the power to make such a grant, or authorize its making.
[8] We are not the only court to struggle with Lybarger: In Fagan v. Superior Court (2003) 111 Cal.App.4th 607, 616, fn. 9, 4 Cal.Rptr.3d 239, the court wrote that Lybarger "harmonized certain provisions of the Public Safety Officers Procedural Bill of Rights Act, reconciling them by employing use and derivative use immunity." But the Lybarger court identified no conflict in the statutory provisions that could be resolved by such a device. Nor did it ever refer to "immunity." It simply overlooked the requirement of immunity, treating the federal exclusionary rule as a substitute for it. In California Correctional Peace Officers Assn. v. State of California (2000) 82 Cal.App.4th 294, 313, 98 Cal. Rptr.2d 302, the court cited Lybarger for the proposition that if a public employer sought to punish correctional officers for "invoking their Fifth Amendment rights without having been offered immunity," the officers could "assert their constitutional rights at the disciplinary proceedings the [employer] would be obliged to commence." The court appeared to recognize, as Lybarger did not, that such punishment was constitutionally impermissible. However it attributed to Lybarger something it does not say. It says that officers can be ordered to incriminate themselves over a Fifth Amendment objection, and that their only protection against compelled self-incrimination is the federal exclusionary rule which, as we have noted, operates only in a criminal trial. Thus, while these cases support limiting Lybarger to cases involving public safety officers, they do not satisfactorily explain its application even when so limited.
[9] The concluding phrase "prosecutions of drivers involved in accidents resulting in damage to the property of others" (Byers, supra, 71 Cal.2d at 1054, 80 Cal.Rptr. 553, 458 P.2d 465) suggests that the chilling effect of a grant of immunity can be confined to prosecutions for a particular offense. In fact, once immunity is granted it will affect the prosecution of any offense to which immunized disclosures relate. The same reservation may be offered to the court's statement that the immunity created there would present "no problem of conflicting state and federal interests" because "it is the state which both demands disclosure of information in `hit-and-run' accidents and prosecutes those who commit criminal acts on the highways." (Id. at p. 1055, 80 Cal.Rptr. 553, 458 P.2d 465.) As one commentator critically observed, "If a motorist has driven a stolen vehicle across state lines or has committed some other federal offense, an obeyed requirement that he or she stop after an accident might produce evidence relevant in federal courts." (T. Buck, Self-incrimination in Civil Litigation: The Evolution of California's Judicially Created Immunities from Murphy v. Waterfront Commission (1982) 9 Hastings Const. L.Q. 351, 365, fn. 90.) Indeed the likelihood that a given instance of conduct will offend federal as well as state law grows apace with the ongoing "federalization" of criminal law. (W. Marshall, Federalization: A Critical Overview (1995) 44 DePaul L.Rev. 719, 724); see E. Chemerinski & L. Kramer, Defining the Role of the Federal Courts (1990) 1990 B.Y.U. L.Rev. 67: W. Schwarzer & R. Wheeler, On the Federalization of the Administration of Civil and Criminal Justice (1994) 23 Stetson L.Rev. 651; W. Coulson, Making a Federal Case Out Of it: The Federalizing of Criminal Law () (as of Jan. 8, 2007.)
[10] The court's use of "immunity" in referring to Coleman and Tarantino marks a seeming departure from its otherwise careful selection of terms. Properly speaking, both of those cases announce exclusionary rules, not immunities. As the court elsewhere recognized, immunity is a prerequisite to and quid pro quo for compelling a person to make incriminating disclosures after he has asserted the right to remain silent. (Daly, supra, at p. 147, fn. 9, 137 Cal.Rptr. 14, 560 P.2d 1193.) As we have noted (fn. 6, ante), Coleman adopted an "exclusionary rule" and called it that. (Coleman, supra, 13 Cal.3d at p. 897, 120 Cal.Rptr. 384, 533 P.2d 1024.) In Tarantino, supra, 48 Cal.App.3d at p. 471, 122 Cal.Rptr. 61, the court held that a defendant's statements to a psychiatrist assessing his fitness to stand trial are not admissible against him to establish guilt. Although the court pronounced this a "judicially declared immunity" which was "reasonably to be implied from the code provisions" governing such inquiries (id. at p. 469, 122 Cal.Rptr. 61), the regime it adopted was an evidentiary rule of exclusion, not an immunity. There is no suggestion that the defendant had asserted his right to silence when questioned, or that the state would have sought to compel him to speak had he done so. Therefore no occasion for immunity arose, and the courts' use of that term was simply inaccurate. The Supreme Court then echoed that usage when it endorsed Tarantino's holding in People v. Arcega (1982) 32 Cal.3d 504, 518, 522, 186 Cal.Rptr. 94, 651 P.2d 338 (Arcega). In support of the "immunity" thus adopted, the court cited Estelle v. Smith (1981) 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (Estelle). But that case held only that statements to a competency examiner were inadmissible where the defendant had not been told that his answers would be used against him at trial-a pure example of an exclusionary rule. (Id. at p. 469, 101 S.Ct. 1866.) The terminological inaccuracy appears most starkly in Arcega's statement that Estelle "specifically discussed the provision of immunity" on particular pages. (Arcega, supra, at p. 523, 186 Cal.Rptr. 94, 651 P.2d 338, citing Estelle v. Smith, supra, 451 U.S. at pp. 466-469, 101 S.Ct. 1866.) In fact the word "immunity" does not appear anywhere in Estelle.
[11] Here, for instance, if investigators had disclosed the contents of plaintiff's immunized statements while questioning the witness Boyd, a later prosecutor might have been required to prove that Boyd's account of events at plaintiff's criminal trial was entirely unaffected by that exposure. In the Oliver North case, prosecutors attempted to forestall such difficulties by "cann[ing]'" their case, i.e., placing evidence under seal before any witness gave, or was exposed to, immunized testimony. (See United States v. North, supra, 910 F.2d at p. 871.) The resulting convictions were nonetheless reversed because the trial court had conducted insufficient inquiry into the effect of witnesses' exposure to immunized testimony. (Id. at p. 872; see id. at pp. 863-864.) The trial court was directed on remand to "proceed witness-by-witness," and if necessary, "line-by-line and item-by-item," to establish the extent to which witnesses' testimony had been influenced. (Id. at p. 872.) On remand, after a witness stated that his trial testimony had been heavily influenced, the prosecutor conceded that he was unable to meet his burden, and the case was dismissed. (C. Weisselberg, Saving Miranda (1998) 84 Cornell L.Rev. 109, 150, fn. 207.)
[12] This is not to say, and we do not decide, that a trial court could not, in a proper case, grant immunity for these purposes if a proper basis for jurisdiction were established. Judicial oversight, combined with the notice to prosecutors mandated in Daly, could go far to cure the objections we have noted. We hold only that in the absence of some semblance of legislative authority, a public employer has no power to peremptorily and unilaterally immunize statements of its employees, and that in the absence of such a grant of immunity, it cannot lawfully compel them to answer incriminating questions, or punish their refusal to do so.
[13] Thus plaintiff asserts that the privilege extends to statements attributed to Boyd in a memorandum prepared by Alayne Bolster, a public defender's investigator, concerning her interview of Boyd on March 28, 2003. Among other things, Boyd reportedly told Bolster that when plaintiff showed up at the house, Boyd said to him that he already knew he had an outstanding warrant; that plaintiff's client Dignan had been living in the house for about a month when he was arrested; and that he, Boyd, would "`say the same thing in court.'" According to Boyd, plaintiff replied that Boyd obviously would not help his case, that he did not want him as a witness, and either that it would have been better if he had been gone, or that it would have been better if he had moved to Oregon. Boyd reportedly quoted plaintiff as saying one or more of the following: "`It would have been easier if I hadn't found you,'" "`I wish you were on the run,'" "`I thought you were on the run,'" or "`It would have been better if you were on the run.'" At the end of the conversation, according to Boyd, plaintiff said, "`Call me in two or three weeks and I will see what I can do to get you back on the calendar,'" an apparent offer to help clear up Boyd's outstanding warrant. Although Boyd told the investigator he did not want any part of being a witness, he said he never told plaintiff he would not go to court.' He also reported telling plaintiff that "he would not want him as a witness because he would be a hostile witness." He told the investigator that he had not responded to previous contacts by the public defender's office because he did not like plaintiff's client, had had problems with him, and was not interested in helping him. He told the investigator that he was pretty upset with the whole situation involving defendant's client. "`Quit f* * * * *g bugging me was how I felt. But I never said I wouldn't testify. I only said I'd tell the truth.'"